CARTIER, INC., et. al., Plaintiffs,

v.

FOUR STAR JEWELRY CREATIONS, INC., et. al., Defendants.

No. 01 CIV.11295.

United States District Court, S.D. New York.

Dec. 10, 2004.

See also 2004 WL 574732.

Milton Springut, David A. Kalow, Tal S. Benschar, Kalow & Springut, LLP, New York, NY, for Plaintiffs.

Robert D. Katz, Robert T. Maldonado, Arian A. Baryalai, Cooper & Dunham LLP, New York, NY, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

### INTRODUCTION AND BACKGROUND

On December 10, 2001, plaintiffs Cartier and Cartier International, B.V. initiated litigation against defendants Four Star Jewelry Creations, Inc., Crown Jewelry Creations, Inc., and Globe Jewelry, Inc. alleging trade dress infringement under Section 43(a) of the Lanham Act, infringement of a registered mark under Section 32 of the Lanham Act, trademark infringement under Section 349 of the New York General Business Law, patent infringement, false designation of origin, and trademark dilution. These claims relate to Cartier's Tank Francaise, Tank Americaine, and Panthere lines of watches. On April 30, 2002 defendants filed their answer and counterclaims, denying plaintiffs' allegations and seeking a declaratory relief ruling that plaintiffs' alleged trade dress and design patents are invalid, unenforceable and were not infringed.[1]

---

1. On December 17, 2002 this case was transferred from United States District Judge Deborah A. Batts to this court.

On February 28, 2003, plaintiffs moved by Order to Show Cause to amend their complaint and for a preliminary injunction ordering, *inter alia*, cessation of further sales of a watch depicted in defendants' 2002 catalog, which plaintiffs contended infringed upon their alleged trade dress in their Pasha de Cartier watch and a registered trade mark for the associated Grille design. Defendants did not oppose Cartier's motion for a preliminary injunction as to the Pasha watches. The request was granted on May 8, 2003 and plaintiffs filed their first amended complaint five days later.

After extensive discovery, this case proceeded to bench trial beginning May 10, 2004, and closing May 25, 2004. Both parties submitted their proposed findings of fact and conclusions of law on July 26, 2004.

The following are the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

### I. THE PARTIES

Plaintiff Cartier is a division of Richemont North America ("Richemont") and the U.S. selling arm of that company. Tr. at 516.[2] Plaintiff Cartier International B.V. is a Dutch company holding all of Cartier's international intellectual property rights and licenses thereto. *Id.* Plaintiffs are referenced hereinafter collectively as "Cartier." They sell luxury watches in exclusive boutiques, high-end department stores, and authorized retailers throughout the United States. Cartier's watches relevant to this litigation range from $2,000 to $150,000.

Defendants Four Star Jewelry Creations, Inc. ("Four Star"), Crown Jewelry Inc. ("Crown") and Globe Jewelry, Inc. (":Globe") are New York corporations owned and operated by Abraham Malek and Mike Genuth. Tr. at 617, 624, 626. Although there are three corporate defendants, they are, in effect, the same company; Crown and Four Star send out virtually identical catalogs retailing Globe's merchandise that they have purchased exclusively from Globe, Tr. at 740–41, 524–25, and all three defendants operate out of the same office on 47th Street in Manhattan. Defendants manufacture watches, bracelets, and watch attachments that they sell at wholesale prices. Tr. at 624–26. Their typical customers are "mom and pop retail stores," most of which are jewelry stores and some of which are wholesalers. Tr. at 625–26, 735–36. The average price of defendants' watches is $1,500 at wholesale. Tr. at 892.

### II. THE RELEVANT MARKET

Ruediger Albers provided expert testimony on behalf of plaintiffs with respect to the luxury watch market. Albers began his employment with the Wempe Corporation, a German jeweler and watch seller, in 1987; he is now the President of U.S. operations. He has a Masters in watchmaking and is involved in all aspects of the watch-making business, including customer service, sales, and advertising. Tr. at 12–19.

The court adopts Albers' testimony that a "luxury" watch generally has a price tag beginning at $600 or $700. Tr. at 25–26. Although one can purchase a watch that performs its time-telling function for approximately $50 or less, luxury watch consumers purchase watches that reflect their lifestyle and express their personality, social and financial status and taste. Tr. at 28–29. Most luxury watches are also "status" watches, meaning they have recogniz-

---

**2.** Richemont also markets several other watch brands. Tr. 430–31.

able, distinguished designs that consumers associate with the particular brand; the brand is a further indicator of craftsmanship and quality. Tr. at 31. As a result, the purchaser and wearer of a luxury watch aligns him or herself with the elite status of the watch.

The key ingredients to retailing and manufacturing a successful luxury watch are brand name and watch design. Tr. at 156–57. Part and parcel of this endeavor is to maintain limited distribution networks throughout the U.S. such that the watches are only sold to select retailers. Tr. at 61–62. If a brand becomes too commonplace or overexposed, it cheapens the image and lessens customers' incentive to purchase such an expensive timepiece. Tr. at 62.

## III. CARTIER'S PANTHERE, TANK FRANCAISE, PASHA, AND TANK AMERICAINE

### A. The Designs of the Cartier Watches

As a preliminary matter, adopting Cartier's terminology, a watch "family" consists of several watches with the same basic design but often with variations in size, strap, bracelet, dials, metals used, or diamond settings. Even with these variations, the court's review of the various families reveals that there is a common appearance to all watches within a family. Tr. at 40; PX 73 at 24–31. Each specific variation in the family is known as a "model" and is identified by a specific reference number. Tr. at 24–31. Occasionally, Cartier will market an "animation"; this is a change in the product offered for a period of time to enhance the product's image and add variety to the family. Tr. at 522. For example, Cartier will offer a family of watches that previously had a white dial around the face with a rose-colored dial framing the face, or a family that previous-

ly did not have diamonds with a diamond setting. *Id.*

Cartier charges defendants with infringing the designs of four families of Cartier watches: Panthere, Pasha, Tank Americaine, and Tank Francaise. For each of these families, Cartier's statement of the elements and combinations thereof that constitute its trade dress are in the Amended Complaint, paragraphs 18, 19, 22, 23, 27, 28, 30, 31, and 34; Tr. at 397.

### 1. The Panthere

The Panthere trade dress consists of the combination of the following design features: a square face with rounded corners; a square bezel or metal frame with rounded corners and screw tips at 1, 2, 4, 7, 8, 10 and 11 o'clock; an outer frame composed of four segments, with the two segments of the outer frame which are horizontal to the frame being rectangular, and the other two pieces of the outer frame which are vertical relative to the case extending horizontally around the corner of the bezel and then vertically away from the case at each corner (both the inner and outer frames may or may not be decorated with jewels); an octagonal winding crown with "cabochon" (i.e., rounded) stone; art deco Roman numerals inclining to conform to the angle-direction of the watch hands at such time as the hands are juxtaposed to that numeral; a "chemin-de-fer" (i.e., railroad) chapter ring or minute guide between the center of the dial and numerals, with every fifth minute indication being thicker and bolder; and a metal bracelet (a watch band made of metal) consisting of five rows of interlocking rectangular links (with the rectangles being approximately three-and-a-half times as long as wide, with the wider side vertical to the watch face), with the links staggered such that the first, third and fifth rows are stag-

gered one-half a rectangle length to the second and fourth rows.

The Panthere is offered in gold, steel, and pavee (i.e., paved with diamonds). Tr. at 533. Currently, Cartier does not include a Panthere watch in its line with a leather strap, although ten years ago Cartier offered a gold Panthere watch with a leather band. Tr. at 108. Such Panthere watches may still be sold by Cartier dealers and boutiques who continue to have them in stock, at auctions, trunk shows, and charity sales. Tr. at 555–56.

### 2. The Pasha

The trade dress for the Pasha watch family consists of the combination of the following design features: a round and thick watch case (i.e., deep) with a thick outer metal bezel surrounding the watch face that slopes downward from the inside of the case to the outside; a removable, screw down cap that covers a central crown, such that in looking at the watch from the front, there are three metals rings of increasing thickness with engraved striations, a fourth thick metal ring, and a cabochon end, with a sapphire or colored stone or rounded stainless-steel dome, all of which is attached to the watch with a chain link; single horned extensions at the top and bottom of the watch case connecting it to the strap, such that the strap fits between the extensions with only one single extension on each side; a lug that extends through the strap/bracelet and the single horned extension with pyramid-shaped caps; Arabic numerals in curly font. On models with a metal bracelet, the bracelet consist of H-shaped links alternating with rectangular shaped links, the width of the H-shaped link being half that of the rectangular link. Some models within the family contain two smaller crowns positioned above and below the central crown. They are capped with non-removable caps, similarly designed to the central cap, and end in matching cabochon.

Some watches in the Pasha family also include a removable grid or "grille." The Amended Complaint identifies this element as a separate trade dress consisting of two sets of equidistant perpendicular lines forming a tic-tac-toe, three-dimensional pattern that overlays the face of the watch to the edges of the bezel of the watch. The Cartier Pasha Grille Design is registered to plaintiff Cartier. PX 222.

The Pasha is offered in stainless steel, chrome, gold, and full pavee with princess cut diamonds. It is also available with a leather strap or metal bracelet.

### 3. The Tank Americaine

The Tank Americaine family's trade dress consists of the following combination of design features: a rectangular watch face, with the longer side being vertical; the portion of the case that frames the watch face consists of thick vertical and horizontal frames (known as "brancards") formed of the case metal, with the corner of the vertical brancards elongated beyond the top and bottom of the watch case, ending in rounded, inwardly curving curves (the frames are sometimes decorated with jewels); the elongated brancard corners partially frame the end links in the bracelet chain or frame the end of the watch strap; a slightly curved case; Art Deco Roman numerals inclined to conform to the angle-direction of the watch hands at such time as the hands are juxtaposed to that numeral; an octagonal winding crown with a faceted stone; a chemin-de-fer chapter ring or minute guide between the center of the dial and the numerals, with every fifth minute indicator being thicker and bolder. Some models include a metal chain bracelet with five rows of linked rectangular plates (sometimes decorated with jewels), with the width of the

third middle row being twice the width of the links in the other rows. The first, third and fifth links are aligned and arranged staggered to the second and fourth row links.

The Tank Americaine is offered in stainless steel, gold, and a full pavee. Tr. at 533–34. It is offered with a metal chain bracelet or a leather strap. Three to four years ago, Cartier discontinued the Tank Americaine with a full pavee dial, but such watches may continue to be sold by dealers and jewelers as part of their leftover stock, in trunk shows, or at charity auctions. Tr. at 568–69.

### 4. The Tank Francaise

The Tank Francaise's trade dress is defined by a combination of the following design features: a square watch face; the case framing the watch consists of thin horizontal brancards and thick concave vertical brancards, both formed of the case metal; at each corner the vertical brancards are elongated beyond the bottom and top of the watch case, and end in inwardly angled corners; the vertical brancards are beveled to slope downward laterally from the inside to the outside (they are sometimes decorated with jewels); the elongated brancard corners frame the end links in the bracelet chain or the end of the watch strap; Art Deco Roman numerals incline to conform to the angle direction of the watch hands at such time as the hands are juxtaposed to that numeral; an octagonal winding crown with cabochon; a chapter ring/minute guide on the watch face located between the center of the dial and the numerals. Some models include a metal chain bracelet with alternating H-shaped and rectangular links, with the end portions of the H-shaped links mimicking the beveled upper and lower corners of the vertical brancards (the links are sometimes decorated with jewels).

Plaintiff Cartier has a registered trademark for the parallel brancards on the Tank Francaise watch case. PX 141, Tr. at 433–34.

The Tank Francaise is offered in gold and steel, with or without jewels on the brancards, and with a metal bracelet or leather strap.

## B. Functionality of Plaintiffs' Watch Designs

Cartier's director of watch marketing, Kristina Skoczylas, provided credible testimony to the effect that Cartier's central focus is on the aesthetic value conveyed by the design of the watch; functional superiority is not among Cartier's objectives. Tr. at 533.

Defendants, however, introduced the expert testimony of John T. Houlihan, former Director of Design of the Timex Corporation, who testified on direct at length as to the functional advantages of the discrete elements of each of the watch families. See Tr. at 276–292. Although the court will not restate his testimony in full, the following are a handful of examples Houlihan cited as evidence of the functionality, as opposed to ornamentality, of Cartier's watch designs: a) with respect to the Tank Francaise, its minute guide allows the watch wearer to determine the time to the minute; the H-shaped links of the metal bracelet keep the bracelet together; the elongated brancard corners protect the end links and link the bracelet chain or watch strap and the watch case; b) with respect to the Tank Americaine, the curvature of the case allows it to conform to the wearer's wrist; the Roman numerals conform to the angle-direction of the watch hands so that the wearer can see the time; the bracelet is formed of links so that it can comfortably fit on a wearer's wrist and attach to the watch face; and c) with the Panthere, the bezel holds the crystal and

the eight screws connect the bezel to the watch face; the crown is shaped like an octagon to facilitate the user's ability to turn it; the fifth minute guide indicator is thicker and bolder to allow the wearer to more easily determine the minute.[3] Houlihan's conclusion, therefore, is that if Cartier were granted exclusive rights to the foregoing features, competitors would be placed at a significant non-reputation related disadvantage and that many features affect the cost or quality of the watches at issue. Tr. 285–292.

On cross examination, however, Houlihan conceded that Roman numerals, a cabochon, an octagonal winding stem, a minute track, a particular face shape, a particular shape of a watch case and its extensions connecting the face to the strap, and a particular bracelet link formation or shape are not essential to the function of a watch, nor do they make it any cheaper or easier to manufacture. Tr. at 367–380. The reason that Cartier's bracelet fits better, for example, is not a function of design, but rather of superior execution. Tr. at 377–378. Finally, Houlihan stated that as a watch designer, if he were prevented from using any one of the elements of Cartier's design, a square face or Roman numerals, for example, this would be a serious limitation; but if he were unable to use all of the various elements in combination, it would not be a serious limitation. Tr. at 381.

Adding to the strength of plaintiffs' case regarding the non-functionality of their watches, Ruediger Albers, who provided expert testimony on behalf of plaintiffs with respect to the luxury watch market, testified that none of the Cartier design features composing its trade dress have any bearing on the watches' functionality and that there are many other designs available to a watch manufacturer. Tr. at 50, 87–95.[4] In actuality, many of the trade dress features increase the time, difficulty and cost involved in their manufacture. *Id.*

The court agrees with plaintiffs that the watch designs at issue are purely ornamental and do not play a functional, essential, or cost-saving role in the manufacture of watches. Defendants' expert testimony was unpersuasive in negating the purely aesthetic purpose motivating Cartier's chosen designs because their expert did not consider the trade dress as a whole but in its discrete parts. Clearly a watch must have a case or a winding stem or numbers or extensions connecting its strap or bracelet to the case; this is a fairly obvious proposition. But what defendants' expert did not or could not explain is why the particular shapes and combination of design elements are necessary to a watch's ability to function. The fact that he agreed that a bar on manufacturing a watch with a combination of features composing Cartier's trade dress as a whole would not seriously limit his options as a watch designer further substantiates the view that the designs are nonfunctional. As such, the court finds that Cartier's claimed trade dress is not functional.

## C. Cartier's Advertising and Promotional Efforts

### 1. *Generally*

The court credits the testimony of Cartier's director of watch marketing, Kristina

---

3. Here again, defendants did not address the Pasha on the grounds that they have already consented to an injunction as to defendants' watches that infringe the Pasha's design.

4. Although Albers was introduced as an expert to provide background relating to the luxury watch market, in light of his considerable expertise in the watch industry, most notably as a watch maker, his opinions regarding the functionality of Cartier's trade dress is nevertheless probative here.

Skoczylas, as to Cartier's media and advertising efforts. Cartier places print advertising in magazines, newspapers and billboards, both nationally and regionally. Tr. at 536. National advertising is placed and paid for by Cartier itself and is not associated with any particular dealer. Tr. at 536. Regional advertising is specific to a region of the United States and may be associated with a particular dealer. Tr. at 536. Destino also explained that Cartier engages in "co-op" advertising which involves a cost-sharing scheme between Cartier and its dealers, pursuant to which the advertisement includes a short text identifying the particular jeweler or dealer sharing in the cost of the ad. Tr. at 410.

For all three types of advertising, the advertising is created by a company hired by Cartier. Cartier's advertisements adhere to a common theme or design; they exclusively show a Cartier watch in an enlarged size with a dramatic or colored background. Tr. at 40–42. The focus of these advertisements is on the watch; as a general rule, there are no other words or images distracting from the central focus on the timepiece, and the watch itself appears to take up more than 80% of the surface of the advertisement. *See* PX–202, 245, 412–13. In addition to print advertising, Cartier distributes catalogs via direct mail, through its authorized dealers, and in its boutiques. Tr. at 518; PX 70, 72–75, 78. Cartier also hosts "trunk shows" in which it shows a collection of watches to dealers. Tr. at 538.

### 2. The Panthere

Cartier introduced the Panthere in the United States in 1984 with a considerable product-launch event in its Manhattan store featuring two real-life panthers and in its Los Angeles location. Tr. at 416–17. Cartier dealers also replicated Cartier's launch on a lesser scale in their own lo-cales with local press, clientele and window displays. Tr. at 417–18. Over the next five to six weeks after the initial unveiling, Cartier held cocktail parties in several stores to which Cartier invited its retail clientele. Tr. at 417. The overall launch budget for the Panthere was in excess of $1,000,000 dollars, including considerable resources spent towards advertising in periodicals and magazines. Tr. at 417–18.

In the years following Panthere's introduction into the U.S. market, Cartier spent about $500,000 on media spending to promote the Panthere. Tr. at 419; PX 123, 128. The advertisements appeared in periodicals including the Los Angeles Times, The New York Times, The Wall Street Journal, the Oregonian, Park Cities News, the Palm Beach Post, and the Connecticut Post. PX 128, 131, 135. *See, e.g.,* PX 278, No. 20382 (New York Times Panthere advertisement, November 7, 1984); PX 279, Nos. 20114, 20115 (Wall Street Journal Panthere advertisements, March 13, 1992, published in five different regions in the United States).

### 3. The Pasha

Cartier introduced the Pasha watch family in 1985 as a modern version of a watch created by Louis Cartier in 1944. In the years 2000 and 2001, Cartier spent upwards of $1,000,000 and $2,000,000 dollars respectively in advertising the Pasha. PX 243. Its print advertisements have appeared in publications including the Los Angeles Times, Greenwich Magazine, the Atlanta Journal, the Chicago Tribune, the Denver Post, the Texas Monthly, Providence Journal, the Las Vegas Review Journal, The Aspen Times, The Washington Post, The New York Times, and Boca Raton Magazine. Plaintiff also introduced as exhibits numerous examples of standard Pasha advertisements that have run in a

variety of publications over many years. Tr. at 422,–24; PX 245.

### 4. The Tank Americaine

Cartier introduced the Tank Americaine in 1989. Total media spending for the Tank Americaine averages approximately $500,000 per year. PX 123. Cartier has advertised the Tank Americaine in publications including Architectural Digest, Conde Nast Traveler, GQ Magazine, Hamptons Country Magazine, Wine Spectator, Forbes, and Travel and Leisure. PX 129, 132. Frank Cologni authored a coffee table book entitled "Cartier, the Tank Watch," that Cartier gives to clients as gifts or distributes in its boutiques. Tr. 542–43; PX–95. The book expands the visibility of both Tank watch families at issue.

### 5. The Tank Francaise

Cartier launched the Tank Francaise in 1996. It hosted a launch party at the Salon Internationale D'Haute Horloger, a major annual watch fair held in Switzerland, and in New York, where its launch party reflected the watch's design by adopting a theme reflecting Paris's square architecture.[5] Tr. 528, 570. Since then, total media spending ranges from over $500,000 in 1999, to as much as $1,750,000 in 2000. PX 123. Advertisements for the Tank Francaise have appeared in, *inter alia*, Town & Country, In Style, various theatrical and musical playbills, the Harvard Crimson, The New York Times, Vogue, The New Yorker, and Vanity Fair.

### D. Sales

The Panthere is Cartier's fifth best-selling watch. Tr. at 535. At the time of its introduction into the U.S. market, the Panthere was $1,800 for the stainless steel

model, $11,000–14,000 for the gold, and $2,200 to $2,700 for combinations of stainless steel and gold. Tr. at 420–21. At present, the steel versions retail beginning at $2,450, the gold go up to $11,400, and pavee versions sell for approximately $50,000. Tr. at 533. Between the years 1987 and 2002, Cartier and its authorized dealers sold 88,175 watches in the Panthere family for total sales over $313 million.

The Pasha is Cartier's fourth best-selling watch. Tr. at 535. Currently, steel versions retail for about $3,700, chrome and other versions from $6,000 to $7,000, 18 karat gold versions for about $30,000, and a full pavee Pasha with princess cut diamonds for about $208,000. Tr. at 535. Between 1987 and 2002, Cartier sold over 42,000 units for sales totaling over $180,000,000. PX 242.

The Tank Americaine is Cartier's third best-selling watch. Tr. at 535. Gold Tanks with a leather strap begin at $5,500 and increase to $10,000 to $20,000 for models with metal bracelets, and a full pavee Tank retails for about $88,000. Between 1987 and 2002, Cartier sold 14,225 watches for sales totaling over $102 million. PX 124.

The Tank Francaise is Cartier's top-selling watch family. Between 1987 and 2002, Cartier sold 93,750 Tank Francaise watches, for sales totaling over $266 million.

### E. Recognition of the Cartier Watches in the Press and Among Consumers

#### 1. Press Commentary

Cartier introduced an impressive body of exhibits during trial illustrating the

---

5. The watch's square shape was designed to reflect Paris's predominant architectural format. Tr. 528.

depth of media commentary about the four watches at issue, both in the popular press and in the more specialized watch and luxury goods press. *See* PX 96A—114A. Although it is unnecessary to regurgitate the full panoply of press commentary, the following are indicative examples: the New York Post, December 16, 1998, quotes actress Gwyneth Paltrow as stating that her desired wristwatch is a Cartier Tank watch with a leather strap and sapphire winding stem. PX 252. Another article in the New York Post in 1998 states that "the timeless style of the Cartier Tank Watch with an alligator strap still goes as well with a Harris tweed blazer as it does an Armani tuxedo." *Id.* In October of 2000, the magazine Retail World identifies the Tank Americaine as a "coveted worldwide ... Cartier classic." *Id.* In June 2001, Watch Time, whose audience largely consists of watch aficionados, reported that "the world-renowned Cartier brand bases its strategy on the virtue of being instantly recognizable." *Id.* In 1999, Watch Time also wrote: "Representing everything a sporty-yet-elegant wristwatch should be, the Cartier Pasha has, in fact, become a sought after treasure among luxury timepieces limited in numbers only because of its high price. ... The watch, [is] designed to be recognizable as a Cartier. . . .Among the unmistakably Cartier characteristics are the threaded shaft lungs which dominate the slide view." *Id.* In International Watch in November of 1991, the Cartier Panthere is identified as a "classic watch." In its April–June 2001 edition, the Robb Report writes that "the Cartier Tank is arguably one of the most recognizable status watches today." *Id.* In 1997, the Robb Report honors the Cartier Tank Francaise in its "Best Awards," noting that the Tank Francaise is "an interpretation in line with an inimitable century old tradition that both elevates and combines good taste and contemporary styling." *Id.*

### 2. Consumer Recognition: the Expert Reports

Defendants and Plaintiff both conducted surveys to test the secondary meaning of the four families of Cartier watches at issue. Simply stated, the parties retained experts to poll the public as to whether they associated the Panthere, Pasha, Tank Americaine, and Tank Francaise, or more specifically, their watch designs, with Cartier.

#### a. Defendants' Expert: Mr. Harry O'Neill

Defendants retained Mr. Harry O'Neill, Vice Chairman of Roper ASW.[6] Mr. O'Neill's report is hereinafter referenced as the "Roper Report."

The Roper Report was created by intercepting shoppers at six shopping malls throughout the country: Atlanta, Boston, Chicago, Dallas, Los Angeles and San Francisco. Tr. at 175; DX–Y6. O'Neill attempted to pick malls with "relatively upscale stores" in order to maximize the likelihood of identifying survey participants who represented the appropriate population. Tr. at 176. O'Neill concluded that a mall that was anchored by Sears or Kmart, for example, would be unlikely to be frequented by consumers in the luxury watch market. *Id.*

At the malls, shoppers were intercepted and screened to determine their eligibility to participate. Tr. 169. Shoppers who were under 18, did not have their glasses or contact lenses available but relied on them, or who worked for an advertising company, market research company, or watch retailer or manufacturer were ineli-

---

**6.** Roper ASW was the name of the company at the time of the survey.

gible to be surveyed. *Id.* Shoppers were further asked whether or not they owned a watch worth at least $2,500. DX–Y6, Ex. 1, A. If so, they were qualified to answer the survey's questions. If not, they were asked: "How likely is it that you would consider buying a fine watch—one that would cost at least $2,500—in the next couple of years—very likely, fairly likely, not very likely or not at all likely?" *Id.* Those who responded indicated that they were "very likely" or "fairly likely" qualified to participate.

Eligible participants were then shown pictures of a Cartier Tank Francaise, a Cartier Tank Americaine, a Cartier Panthere, and five other watches made by other manufacturers, namely, Chopard, Rolex, Tag Heuer, Movado and Bvlgari. Tr. at 172.[7] With each picture, a participant was asked: "Do you associate this style or design with the watches of one or more than one company?" Tr. at 174. If so, although unnecessary to establish secondary meaning, as an "added extra attraction," participants were asked a second, follow-up question as to whether they recognized to which particular company the watch belonged. *Id.*

The results of the Roper study are as follows: 38% of the respondents associated the style or design of the Tank Americaine with one company (with 13% correctly identifying Cartier as that company); 34% of the respondents said that they associated the style or design of the Tank Francaise with one company (with 13% correctly identifying Cartier as that company); 31% associated the Panthere style or design with one company (with 13% correctly identifying Cartier as that company). Based on these figures in the Roper Report, O'Neill concludes that a significant portion of the purchasing public does not

associate the style or design of the watches at issue with Cartier. Tr. at 180.

What is noteworthy to the Court, however, is the considerable discrepancy in findings at the Atlanta mall vis a vis the results obtained in surveying shoppers at the other five malls. Of the six malls involved in creating the Roper Report, only the Atlanta mall was anchored by upscale retail establishments. Whereas the Atlanta Mall was anchored by Neiman Marcus and Bloomingdales, the Boston mall was not anchored by any high-end stores, although there was one within five minutes' walking distance, the Chicago mall was anchored by Marshall Fields and Carson Pirie Scott and the Dallas mall was anchored by a Dillar Folis and a Mervins. Tr. 199. Further, in Atlanta, 69% of survey respondents owned a watch worth at least $2,500, compared to the 41% of respondents at the other locales. For those who did not already own a fine watch, 55% of the participants were "very likely" to purchase one in the near future, compared to 15% of the participants who answered in similar fashion at the other malls. Accordingly, the court concludes that the population of survey respondents at the Atlanta mall was the most representative of the Cartier consumer population. Here, 63% of the participants associated the style and design of the Tank Francaise with one company, 60% of respondents associated the Tank Americaine with one company, and 60% associated the style or design of the Panthere with one company.

*b. Plaintiffs' Expert: Dr. Sidney Lirtzman*

Dr. Lirtzman criticized the Roper Report on the grounds that it surveyed the wrong population insofar as it failed to distinguish between those "very likely" to purchase an expensive, luxury timepiece in

**7.** O'Neill did not include the Pasha in his survey.

the near future, and those who were "fairly likely" to make such a purchase. Tr. 232. He testified that the survey results from Atlanta indicate that if the Roper Report had been conducted exclusively at "high end malls" and included only those persons more resolute about their intentions of buying a fine watch, the numbers of participants identifying the style or design of the three Cartier watches with one company would have been higher. Tr. at 250–51.

To support this conclusion, Lirtzman conducted his own survey designed to parallel O'Neill's, with the exception of two important differences: Lirtzman only interviewed individuals who either already owned a luxury watch or were "very likely" to purchase a watch in the next year, whereas the Roper Report includes respondents who were "very likely" to purchase a watch "in the near future" and persons who were "fairly likely" to purchase such a luxury watch "in the next couple of years." Further, Lirtzman intercepted individuals while they were shopping not in shopping malls, but in Tourneau Watch Company stores, two in Manhattan and one in the Roosevelt Field Mall on Long Island, NY, one in Costa Mesa, CA, and one in Century City in Los Angeles, CA. Tr. at 321–22. Tourneau is an authorized dealer of Cartier watches. Tr. at 639. In light of this relationship, the Tourneau stores feature prominent posters of Cartier watches as well as display cases with Cartier watches. Tr. at 190, 823–25, 829.

The Lirtzman study also included a few less significant alterations from O'Neill's study. Lirtzman asked if the participants associated the watch's design with a particular source, as opposed to asking about whether the participant associated the "design or style" with a particular source. Tr. at 236–37. Because it is irrelevant to es-

tablishing secondary meaning, Lirtzman also did not ask O'Neill's second question as to whether the participant could identify which company she or he associated with the watch's design. The Lirtzman study was also limited to the Tank Francaise and the Panthere because these watches were the least recognized according to the Roper Report. Lirtzman showed participants pictures of the Tag Heuer and Movado watches, like the Roper Report, achieving the same percentages for recognition of these watches among participants, Tr. at 241, but excluded the other controls. Finally, the photographs shown to survey participants in Lirtzman's study are increasingly clear and more uniform than those shown to participants in the Roper study.

The results of Lirtzman's study are as follows: 61% of the survey respondents associated the Tank Francaise's design with a particular source and 63% of the survey respondents associated the Panthere with a particular source. Tr. at 250–51. Lirtzman concludes from this result and the Atlanta results in the Roper Report that surveying individuals who either own or are very likely to purchase a luxury watch establishes consumer recognition of the Cartier watch families at issue in the range of 50 to 60%. *Id.*

Defendants' principal objection to Lirtzman's report is that in light of the Cartier posters at Tourneau and the fact that its watches are among those displayed in Tourneau's cases, the result of the study are biased. *See* Def. Proposed Findings of Fact and Conclusions of Law at 18. The court, however, disagrees. There are a panoply of luxury watches prominently featured at Tourneau, both in the display cases and on the walls as posters and murals; Tourneau changes its displays every few months; and there are 110 brands sold at Tourneau, all of which have multi-

ple lines or models within them. Tr. at 219, 666, 833. The Cartier case, for example, contains six to a dozen watch models, including the watches at issue. Tr. at 830. As such, while Cartier is sold at Tourneau and is displayed among the many images a consumer perceives while shopping there, the likelihood that a survey participant's reaction to the Tank Francaise and Panthere would have been so influenced is so minimal as to have little to no effect on the probative value of Lirtzman's report.

Moreover, the court credits the testimony of Dr. Lirtzman that valid market research does not require a secondary meaning survey to be conducted in a vacuum given the nature of the questions posed to the survey participants. Tr. at 237, 331–32, 338–42. At Tourneau, consumers were asked questions in an environment in which one would actually purchase a luxury timepiece. Images of the products to be sold are customary in such an environment. Had the Lirtzman's pollsters asked about particular brands of the watches shown to participants surrounded by promotional images, this would raise the specter of potential bias; but here, where the question was simply whether a participant associated the watch with a particular company, without asking which one, no such concern arises.

Therefore, in light of a) the results obtained by defendants' expert in Atlanta, where the survey was undoubtedly taken in a mall where higher-end merchandise is sold, meaning, an environment more consistent with Cartier's consumer population, and where the respondents were increasingly likely to either own or purchase a luxury time piece in the immediate future; b) plaintiffs' survey showing that the Atlanta results are more likely to be accurate than those obtained in other fora; and c) the Court's concerns about the absence of persons within the age group 18–34 or

mistakes in tabulating their survey results in the Roper Report, see Tr. at 214–15, PX–285, the court adopts the testimony of Dr. Sidney Lirtzman, finding that the results obtained in Atlanta and in the Lirtzman Report are representative of the secondary meaning of the watches at issue.

### 3. Consumer Recognition: Third Party Retailers' References to Cartier in Promoting their Watches

Cartier introduced evidence to the effect that third party sellers invoke Cartier's name in selling their watches as a means of appealing to consumers. As exhibited by various printouts from web sites selling watches, the practice is especially rampant among internet sellers who often use such terms as "Cartier style," "Tank style" or "Panthere style." PX–241, 283; Tr. at 455–56. Cartier also employed an investigator, Ms. Sharon Round, in the summer of 2003 to canvas 47th Street in Manhattan, during which she posed as a potential watch purchaser of various retailers in the area. PX 232–235. PX 273 is a business card from a retailer named Aviannes that Round frequented; on the back of the card, the salesperson wrote, "Tank Francaise style $4,500" and "Panthere with diamond bezel $2,325." She further testified that at Agosta Watch, Samo's Sons, Yaeger Watch Corp. and Niletti Creations, salespersons represented that they sell watches that are copies of the Cartier watches at issue or that their watches are "Cartier style" or look "just like" Cartier's. See Tr. at 592–684.

This evidence further solidifies plaintiffs' claim that their watches enjoy recognition among the watch-consuming public. The fact that other retailers continuously invoke Cartier's name in promoting their watches shows that customers attach meaning to the terms "Tank style" or

"Panthere style" that in turn heightens their motivation to purchase.

### 4. Historical Timing of Public Recognition of the Cartier Watches

Having concluded that the majority of the luxury watch-consuming population identifies the watches at issue with one source, the question is at what point in time did the Cartier watches attain such recognizable status.

The Panthere was introduced in 1984. According to Ralph Destino, former President and Chief Executive Officer from 1976 until 1985 and Chairman from 1985–2000, the response to the Panthere was so overwhelmingly successful that stores kept waiting lists of the watch shortly after its introduction into the market. Tr. at 419–20. Both Destino and Albers presented credible testimony that the watch was well-established and well-recognized by 1987. Tr. at 38, 47, 421. In light of the considerable resources dedicated to the Panthere's launch and in the years thereafter, the court finds that the Panthere was well recognized by 1987.

The Pasha was first launched in 1985. Between the 1999 article in Watch Time identifying the Pasha as a classically recognizable Cartier, see PX 252, Albers' testimony that all of the watches at issue were publicly recognized within 3 or 4 years of their introduction, Tr. at 48, the considerable sales of the Pasha watches between 1987 and 2002, PX 243, and Skoczylas's testimony that the Pasha has always been a popular Cartier family, Tr. 532, the court finds that the Pasha achieved public recognition by 1989.

The Tank Americaine was first launched in 1989. Albers testified that Tank Americaine sales have been steady and rapid since its introduction. Tr. at 38, 530. The court's review of Cartier's sales history of the Tank Americaine reveals that by 1994,

sales of this watch family were considerable, grossing more than $3.5 million for Cartier that year. In consideration of these evidentiary items coupled with the strength of evidence presented regarding advertising and media expenditures for the Tank Americaine, the court finds that the Tank Americaine achieved public recognition by 1994.

The Tank Francaise was launched in 1996. Cartier's sales history shows that by 1997, the Tank Francaise was an overwhelming success, grossing $29 million for Cartier that year. Both Albers and Skoczylas provided credible testimony that the Tank Francaise was an instant success, with Skoczylas further adding that the watch quickly became an "icon with fashionistas" and "everyone is wearing it" in the Hamptons. Tr. at 528–29. The court finds that the Tank Francaise enjoyed public recognition by 1996.

### F. Similarity of Third Party Watch Designs to Cartier's

Defendants spent a great deal of effort during trial to debunk the view that Cartier's four watch families have achieved secondary meaning. They introduced evidence designed to show that many watch manufacturers design and retail watches that look identical or substantially similar to Cartier's on the theory that such widespread use of Cartier's design negates secondary meaning. The court will examine each of the allegedly similar third party watches in turn.

### 1. The Tank Francaise

First, defendants aver that the ESQ Chronicle manufactured by Movado bears a strong resemblance to the Tank Francaise. DX–R5 at 31; DX–P3 at 31. The court agrees that a side-by-side comparison of the Chronicle and the Tank Fran-

caise reveals a striking likeness between the two. However, there is no evidence before the court of advertising expenditures for the Chronicle, its sales have been relatively small in the U.S. watch market, and, most importantly, Movado agreed to discontinue selling the Chronicle at Cartier's request. *See* Tr. at 872 (testimony of Stuart Diamond, Movado's Chief Operating Officer).

Second, defendants point to Swatch's Balmain Elysee, DX–S5 at p. 47, as a third-party design bearing strong resemblance to the Tank Francaise. A side-by-side comparison of the two watches does not illustrate a likeness between the two watch designs; the Balmain's watch face is square, its brancards are not sharp like the Tank's, the bracelet links have rounded edges compared to the straight, sharp edges of the Tank, and the Balmain does not have a dial at all analogous to Cartier's. Further, Swatch's logistic and planning manager, Robert Piusiensky, testified that Balmain sales are small and before an order is placed for a Balmain, Swatch must first receive an order from one of its accounts. Tr. at 797–98.

Third, defendants argue that the Concord La Tour features a design that is similar to the Tank Francaise. DX–D1. Comparing the two, Concord's bracelet is too different from the Tank's to warrant a finding of substantial similarity between the two watches. The Tank's bracelet links are H-shaped and imitate the sharp downward angle of the corners of its brancards. By contrast, Concord La Tour's bracelet has relatively small rounded links lined up in rows, four across. They are neither as stark or as bold as the Tank's. Further, there is no analogous gap between the LaTour watch case and the bracelet like the Tanks's and its horizontal brancards look nothing like the Tank's.

Finally, defendants identify Guess as manufacturing and selling a watch looking like the Tank Francaise. DX–L3. This assertion is easily disposed with; a side-by-side comparison reveals only scant similarity between the two watch designs. Most notably, the bracelets and vertical brancards are completely dissimilar.

### 2. The Tank Americaine

Here again, defendants point to several watches that they claim look just like the Tank Americaine, namely, the ESQ Venture, DX–P3, and watches manufactured by Tourneau, DX–Q9, Longines, DX–Q5, Bulova, DX–F1, and Balmain, DX–S5 at p. 42.

Having compared each of these watches to the Tank Americaine, the court gives scant weight to this argument. The two most salient factors supporting this conclusion are 1) none of the watches defendants point to are as rectangular in shape as the Tank Americaine and 2) none of the watches defendants point to have a remotely similar bracelet design. The Venture has Arabic numbers instead of Roman numerals and bears a circular minute track, whereas the Tank Americaine does not. Their crowns are also noticeably dissimilar. The overall appearance of the Tourneau at DX–Q9 is so completely different than the Tank Americaine as to require no discussion at all. Further, the watches shown in DX–19, a Tourneau 2002 catalog, feature brancards with a multi-step design that is not a similar design feature of the Tank Americaine. The Roman numerals of the Longines watches are unlike Cartier's, its brancards have square rather than rounded edges and are not as elongated as the Tank Americaine's, nor does its crown feature a stone like the Tank Americaine's. Even if this watch is a top-seller for Longines as Thomas Vitulano, Longines' sales and operating manag-

er testified, it does not detract from the distinctiveness of the Tank Americaine's design. As to the Bulova, given the difference in dial, shape, crown, and bracelet, it is beyond cavil that one would confuse it with a Tank Americaine; the overall impression is totally different. Finally, the Balmain's brancards are thin; it does not have the long, lean look of the Tank Americaine, the winding stem is not octagonal like the Tank's, and its dial is unmistakably different than the Tank's.

The court therefore finds that the third party watches defendants point to are not sufficiently similar to Cartier's Tank Americaine as to detract from the Tank's uniquely recognizable design.

### 3. The Panthere

Defendant relies most heavily on three watches to negate the Panthere's secondary meaning: two Concord Versailles watches and one Movado. DX–05, DX–V6 and DX–P5 at 15. With respect to the Versailles shown in DX–05, even one of plaintiffs' witnesses agreed that they looked alike: Albers stated that the two are in fact confusingly similar. Tr. at 135–37. Defendants' witness Houlihan likewise testified that the watches are similar to the Panthere. Tr. at 352–53. However, Dube stated that the proportional distinctions and absence of screw tips in the Versailles rendered them sufficiently distinct. Tr. at 494–501. A side-by-side comparison of the Versaille and the Panthere reveals that the watch shape and dial are indeed quite similar, but their bracelets are decidedly different. Equally as important, having sold only nine Versailles watches annually on average for the years 1998–2001, DX–I11, it is difficult to conceive how the Versailles could detract from consumer recognition of the Panthere watch family. With respect to the Concord displayed at DX–P5, p. 15, Concord and its authorized dealer, Bailey

Banks & Biddle, discontinued selling this watch at Cartier's request, Tr. at 443–45.

### G. Cartier's Efforts to Protect Its Trade Dress

#### 1. Generally

There are four individuals on Cartier's staff exclusively dedicated to protecting Cartier's intellectual property and its related "zero tolerance" policy towards infringers. Tr. at 432, 435. Cartier introduced a range of past "cease and desist" letters addressed to third parties that Cartier believed to be infringing on its intellectual property. PX 136–140, 142–80, 181–201, 207–21. In situations when the recipient of such a letter has not complied with Cartier's request, Cartier has filed suit. PX 138, 142. Moreover, Cartier employs an investigator to canvas 47th Street in Manhattan to detect potential copy-cats. Tr. at 484–86.

The success of Cartier's enforcement efforts is substantiated by the fact that Tourneau agreed to stop selling a watch that allegedly infringed upon Cartier's Tank Americaine after having received a cease and desist letter. Tr. at 443, 660–62. Similarly, Concord agreed to stop selling watches Cartier believed to infringe upon its Panthere trade dress. Tr. 443–45. Movado likewise agreed to discontinue sales of an ESQ brand "Chronicle" watch Cartier believed to infringe upon its Tank Francaise watch design. Tr. at 443–47; 872.

#### 2. With Respect to Defendants' Accused Watches

The court credits the testimony of Cartier's counsel, Bharat Dube, that Cartier did not learn of defendants' activities with respect to the watches in question until late 2000 when it discovered Globe's catalog. Tr. at 464. The evidence is undisputed that defendants' offices were not visible on

47th street, that a passerby would have to be buzzed in to visit their offices, and that defendants' sales of the accused watches are relatively few and scattered throughout the United States. Tr. at 603–04, 623, 632, 905; PX 19. There is, therefore, no reason for the court to believe that plaintiffs should have or did learn of the defendants' sales and advertisements any sooner than late 2000.

## II. DEFENDANTS' WATCHES AND ACTIVITIES RELATING THERETO

### A. The Accused Watches

#### 1. Defendants' Watches Accused of Infringing the Tank Francaise's Trade Dress

Plaintiffs charge Globe XW98, GW882, W1984, W1986, W1989, GW863, GW892, GW866, W1994, XGW265, XGW266, GW875 and Crown Classic L803, L901, L1004, L1005, L1006, L1007 with infringing its Tank Francaise Trade Dress. See PX 255. The court finds that the accused watches are indeed strikingly similar in design to the Tank Francaise, if not virtually identical. The brancards on defendants' watches are the same design, width, and proportion in relation to the rest of the watch. The Roman numerals are identical. Their watches bear the same H-shaped bracelet links. The watch face is square, exactly like the Tank Francaise's. Like the Tank Francaise, the winding crown is a faceted octagon set with a cabochon stone. While some of defendants' watches have brancards covered with diamonds or a pavee watch face or sometimes both, these alterations to watches that are otherwise identical to the Tank Francaise do not alter the court's finding of similarity, especially given that Cartier has offered watches in the Tank Francaise family with pavee brancards, pavee bracelets, and pavee faces. See PX 73 at 26–29, PX

75 at 31; PX 86 at 56 (Cartier catalogs). By the same token, although some of defendants' accused watches feature a leather strap, every other design feature of the watches is identical to the Tank Francaise and Cartier has offered the Tank Francaise with a leather strap. See, e.g., PX 72 at 54–55, 67; PX 73 at 6, 9, 28, 30–31; PX 86 at 56 (Cartier catalogs).

#### 2. Watches Accused of Infringing the Tank Americaine Trade Dress

Plaintiffs charge defendants' watches Globe XW39, XW40, XW41, XW43, XW42, XW46, XW49, XW50, XW51, XW57, XW58, XW59, XW56, XW60, XW61, XW66, XW67, XW68, XW95, XW96, XW97, GW880, GW881, W1982, W1988, W1992, W1993, GW755, W1688, XGW267, XGW268, GW879 and Crown Classic L801, L804, L805, L806, L807, L906, L1001, L1002, and L1003 with infringing the trade dress of their Tank Americaine watch family. See PX 256. Here again, the court has little trouble finding that defendants' watches are, in some cases, virtually identical, and in others, undeniably similar to Cartier's Tank Americaine. Like the Tank Americaine, all of defendants' accused watches have a rectangular face, with the longer side being vertical. Their watch faces consist of thick vertical and horizontal brancards formed of the case metal, and at each corner the vertical brancards, like the Tank Americaine's, are elongated beyond the top and bottom of the watch case. Defendants' brancards also frame the end links of their watches' bracelet chain or leather strap, and their winding crown is the same faceted octagon with a stone. Defendants' watches that do not feature a pavee face have the identical Roman numerals and, with the exception of the GW880, on defendants' watch models with a chain bracelet, the bracelet has the same distinctive five-row rectangular

design. The fact that some of defendants' watches have pavee brancards, or part of their bracelet links are covered in diamonds, or have a pavee watch face does not alter the court's conclusion. These watches still adhere to the overall look and design of the Tank Americaine. Equally as important, these watches are similar, if not identical, to Tank Americaine watches offered by Cartier featuring diamonds on the face, brancards, and/or bracelet. *See, e.g.,* PX 72 at 33; PX 73 at 17; PX 74 at 2, 32; PX 75 at 60; PX 86 at 54–55. Cartier has also offered the Tank Americaine with a leather strap. *See, e.g.,* PX 72 at 33, 58; PX 73 at 17, 19, 21; PX 74 at 32, 45; PX 75 at 61; PX 86 at 54–55. Finally, although defendant Globe's GW880 has a dissimilar bracelet link design to the Tank Americaine's, it is nevertheless decidedly similar to plaintiffs' Tank Americaine; every other feature of the watch is identical to Cartier's and its overall look and design is the same.

### 3. Defendants' Watches Accused of Infringing the Panthere Trade Dress

Plaintiffs charge the following watches as violating their Panthere Trade Dress: Globe XW47, XW93, XW94, W2002, W1704, W1703, W1979, W1983, GW610, GW646, W1151, W1262, GW648, W1689, XW1679, and Crown Classic L802, L905, L907. See PX 257.

Like Cartier's Panthere, Globe XW47, W2002, W1704, GW610, W1151, and XW1679 have a square face with rounded corners, surrounded by a square-shaped, one-piece metal frame or bezel, having rounded corners, and featuring eight screw tips set around the bezel at 1, 2, 4, 5, 7, 8, 10, and 11 o'clock. They also all have Roman numerals and bracelets with five rows of links, although some of them have a different link design than the rectangular link design of the Panthere. Some of the watches also have a chemin-de-fer railroad chapter ring or minute guide located between the center of the dial and the numerals, with the same distinctive design of the Panthere, such that every fifth minute is thicker and bolder. In light of these similarities, the court finds these watches to be noticeably similar to the Panthere even in the instances where they slightly deviate from one of the discrete elements comprising Panthere's overall design. Between the shape of the watch face, the rounded corners of the face, the overall proportions, the Roman numerals and the thickness of the metal bracelet relative to the face, the appearance of Globe XW47, W2002, W1704, GW610, W1151, and XW1679 is the same as the Panthere.

Globe XW93, XW94, W1703, W1979, GW646, W1262, XW1678 and Crown Classic L802, L905, and L907 have either a diamond bezel or a diamond watch face, or a diamond bezel in addition to a diamond watch face. They all feature the Panthere square face with rounded corners, surrounded by a square-shaped, one-piece bezel having rounded corners. Except for Crown Classic L802 and L905 featuring pavee faces, these watches all have the same Roman numerals as the Panthere. Globe XW93 and Globe XW94 do not have the same octagonal winding stem with cabochon, but their bracelet has the same five rows of rectangular links, albeit with rounded corners. Globe W1703 has a five-link bracelet link like the Panthere, although with a very different shape to each link, but it also has a chemin-de-fer minute guide like the Panthere's, and a winding crown with a cabochon like the Panthere, framed in an identical fashion. Globe W1979 has the same rectangular bracelet links, although with rounded edges, and the same winding stem with cabochon. It has the same chemin-de-fer minute track, with every fifth minute being thicker and bolder like the Panthere's, although it is on

the outside of the Roman numerals whereas the Panthere's is on the inside. Globe GW646 and W1292 have the same rectangular links as the Panthere's metal bracelet, the same cabochon on its winding stem, and the same chemin-de-fer minute track on the inside of the Roman numerals with every fifth minute being thicker and bolder. Globe XW1678 has a very different bracelet link design than the Panthere. The Globe XW1678 does not have a cabochon on its winding stem, nor does it have a chemin-de-fer minute track. The similarity of the Roman numerals, square face, bezel, and overall proportions nevertheless render the Globe XW1678 very similar to the Panthere. Crown Classic L907 has the same five-link rectangular bracelet design, with the same chemin-de-fer minute track on the inside of the Roman numerals, with the same winding stem with cabochon. Crown Classic L802 and L905 have pavee bezels and faces, although their bracelets have the same rectangular five-link design. Having carefully examined these watches in relation to the Panthere, the court finds them to be strikingly similar to the Panthere. The court is further persuaded by the fact that Cartier has offered the Panthere with a pavee bezel and a pavee bracelet. *See* PX 73 at 38; PX 75 at 39; PX 86 at 58 (Cartier catalogs).

Finally, Globe GW648 and Globe W1689 have leather straps. Both of them, however, have the same chemin-de-fer, square face with rounded bezel, Roman numerals, proportions, and overall look of the Panthere. Even with a leather strap as opposed to the Panthere's customary metal link bracelet, the watches have the same overall design and appearance as the Panthere.

### 4. Defendants' Watches Accused of Infringing the Pasha Trade Dress

Plaintiffs claim that Globe XGW245, XGW 246, XGW 247, and XGW 248 infringe its Pasha trade dress. *See* PX 258. Defendants' watches have the same round and thick watch case with thick outer metal bezel. They have the same removable screw down cap covering a central crown and the same horned extensions at the top and bottom of the watch case connecting the bracelet. They feature the same large Arabic numerals in curly font. Their metal bracelets bear the same H-shaped links alternating with rectangular links. XGW 245 has the two small crowns above and below the central crown, capped with non-removable caps designed similarly to the main cap with matching cabochons. Globe XGW 247 and 248 also have the same grid or grille with a tic-tac-toe pattern that is virtually identical to Cartier's. As such, The court has little difficulty in finding that the watches in question are undeniably similar to Cartier's Pasha.

### B. Timing of Defendants' Entry into the Market with Its Watches

Defendants' 1990 catalog includes watches bearing a striking similarity to the Panthere, Tr. 874–76, DX–C4, leading the court to conclude that defendants entered the market with watches looking like the Panthere at that time. Defendants' 1997 catalog, introduced in late 1996 or early 1997, includes watches bearing a striking similarity to the Tank Americaine, Tr. at 876–77, DX–V3, leading the court to conclude that defendants entered the market with those watches bearing a striking similarity to the Tank Americaine at that time. Defendants' 2000 catalog, first introduced in the fall of 1999, includes W1986 and GW863, both of which are accused of bearing the same trade dress as plaintiffs' Tank Francaise. Tr. at 877–78, DX–S3. The court therefore finds that defendants entered the market with watches bearing a striking similarity to the Tank Francaise

in 1999. Defendants' 2002 catalog features watches that bear a striking similarity to the Pasha. Because the evidence is unclear whether defendants disseminated the catalog in late fall of 2001 or early 2002, the court finds that defendants entered the market with watches with the same overall design and appearance as the Pasha in late 2001 or the beginning of 2002.

### C. Defendants' Activities With Respect to the Watches at Issue

#### 1. Source of Defendants' Watches: Purchase Invoices

Defendants purchased some of the watches accused of infringing Cartier's trade dress from Miotti, an Italian Manufacturer. Tr. at 635, 679. An invoice from one of defendants' transactions with Miotti includes the notation "TK FR" for a number of the watches defendants purchased. PX–9, p. 1. Although Malek testified at trial that he did not understand the notation to mean "Tank Francaise" or "Tank French" at the time of purchase, he admitted that he subsequently understood the notation to so indicate. Tr. at 679–81.

#### 2. Plaintiffs' Undercover Investigation: Defendants' Comparisons of Its Watches to Cartier's in Making a Sale

In addition to canvassing third party retailers of luxury watches on 47th Street in Manhattan, plaintiffs' private investigator, Sharon Round, also visited Defendants at their office on 47th Street in October 2001, posing as a potential purchaser. During trial, Round testified about her visit. As part of her testimony plaintiffs introduced a videotape obtained via a hidden pen camera inside of Ms. Round's eyeglasses. PX 224, PX 224A; Tr. at 581–82. There was no accompanying audio recording to the video tape. *Id.*

Having reviewed the contents of the videotape and Ms. Round's testimony, the court finds that Round was admitted to Globe's office by being buzzed in from the street; defendants' offices were not visible to a casual pedestrian on the street. Defendants' Vice President, Mike Genuth, showed Round inside the office. Upon entering, Round witnessed and videotaped various advertisements taped to defendants' wall that appear to be torn from magazines. Among these advertisements were those belonging to Cartier. Genuth proceeded to show Round a number of watches. Genuth made comparisons to his watches and Cartier's, suggesting that they were the same. Tr. at 579–81. On the videotape, Genuth gestures between his watches and the Cartier watches featured on the wall, even holding his up to the Cartier ads so that Round could make a side-by-side comparison. Even without an audio recording, it is clear that Genuth was highlighting the similarities between defendants' and Cartier's watches.

#### 3. Extent of Defendants' Sales of the Accused Watches

Defendants produced invoices showing sales of watches accused of infringing Cartier's trade dress. *See* PX–19. In his testimony, Malek stated that the invoices collected in Plaintiffs' Exhibit 19 is a complete collection of invoices of defendants' sales from February 1, 1999 until February 8, 2001. During this period, defendants' total sales of the watches in question was approximately $35,000, representing the sale of 22 watches, with gross profits totaling somewhere in the range of $10,000. Tr. at 890–93.

#### 4. Defendants' Reaction to Cartier's Cease & Desist Letter

On November 16, 2001, plaintiffs sent Genuth a "cease and desist letter" asking

defendants to cease and desist further advertising, distribution and sale of merchandise infringing on Cartier's Tank Francaise, Tank Americaine, and Pasha trade dress, as well as a registered trademark and two patents related thereto. PX 30. The return receipt for the letter was signed by someone at defendants' office and returned to Cartier. PX 76. Notably, defendants' office is staffed by Genuth, Malek, and maybe one or two other persons, at most. Tr. at 617.

Genuth claimed that although the letter probably came to Globe's office, he did not see the letter until his deposition in April 2003. Tr. at 618–19. Similarly, Malek testified that he did not see the cease and desist letter until his deposition on February 11, 2003 even though someone in his office signed for the letter. Tr. at 688–89. Before Cartier initiated suit, neither Malek nor Genuth sought legal advice regarding the legality of defendants' sale of the Cartier watches in question. Tr. at 686–87. As such, after receiving Cartier's letter, defendants continued to advertise and offer for sale the watches Cartier identified as potentially infringing its trade dress. Equally as important, defendants offered watches thereafter that it had not yet offered at the time of receipt of defendants' letter. Its 2002 catalog, PX–5, is the first catalog to feature watches bearing a striking similarity to plaintiffs' Pasha. Two of these watches are shown on the catalog's cover-page. Id.[8] Indeed, although Malek testified that he had never seen a Cartier Pasha watch at the time defendants began to sell and advertise their watches looking startlingly similar to Cartier's Pasha, the

video taken by Round and introduced as PX 224A clearly shows a Cartier advertisement featuring a Pasha affixed to defendants' office wall. Tr. at 900–01; PX 224A.

## D. Designations Swiss, Swiss Made and Geneve on Defendants' Watches

Defendants' watches have Swiss movements. Tr. at 738. Defendants feature a very small number of watches in their catalogs with the designation "Swiss Made" on them, although defendants purchased them from Italian manufacturers. Tr. at 691–92; PX 5 at 41. There are also watches in defendants' catalogs with the "Swiss" designation in very small letters at the bottom of the face. See PX 5 at 41, models GW676, GW610.

According to the President of the Federation of the Swiss Watch Industry, Mr. Jean Daniel Pasche, under Swiss law, the term "Swiss Made" is exclusively reserved for watches with Swiss movements, cased in Switzerland, and inspected in Switzerland. Pasche Dep. Tr. at 9; PX 32 at 3. Although Pasche opined that most consumers would expect a watch bearing the designation "Swiss Made" to conform to these standards, there is, however, no such law in the United States or a bilateral agreement between Switzerland and the United States with respect to the terminology. Further, Cartier's counsel testified that to him, the term "Swiss Made" connotes only that the watch has a Swiss Movement. Tr. at 478–79.

Similar rules apply in Switzerland with respect to the designation "Geneva" or

---

8. The court is mindful of Malek's testimony that the 2002 catalog was delivered to defendants' offices by October, 2001, prior to having received Cartier's cease and desist letter. The court does not find this testimony to be credible in light of the fact that a) defendants did not produce it in response to plaintiffs' September 2002 document request for copies of defendants' catalogs and b) one of defendants' own representatives informed an investigator holding herself out as a potential customer that the 2002 catalog was created in December of 2002 and was current through December 2003.

"Geneve." The Swiss Watch Federation has a policy that any watches bearing this designation have a close affiliation with the famous Swiss city and canton, Pasche Dep. Tr. at 11–13, PX–33, but no such policy or rule applies in the United States.

## CONCLUSIONS OF LAW

### I. Standard of Review

■ To secure a permanent injunction in this Circuit, a plaintiff must show: (1) irreparable harm and (2) success on the merits. *Omnipoint Communications, Inc. v. Village of Tarrytown Planning Bd.*, 302 F.Supp.2d 205, 225 (S.D.N.Y.2004). "[T]he standard for a permanent injunction is essentially the same as for a preliminary injunction, except that the plaintiff must actually succeed on the merits." *Dodge v. County of Orange*, 282 F.Supp.2d 41, 71 (S.D.N.Y.2003). "In the trade dress context, a showing of likelihood of confusion as to source will establish a risk of irreparable harm." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir.1995).

### II. Trade Dress

Section 43(a) of the Lanham Act prohibits a person from using "any word, term, name symbol or device, or any combination thereof" that is "likely to cause confusion ... as to the origin, sponsorship, or approval of his or her goods." 15 U.S.C. § 1125(a). Section 32(1) of the Act requires an additional showing that the relevant mark is registered. 15 U.S.C § 1114(1).

■ The Second Circuit has warned that the courts must exercise "particular 'caution,' when extending protection to product designs." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114 (2d Cir.2001) (citing *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir.

1997)). Because trade dress claims raise a risk that relief will "impermissibly afford a level of protection that would hamper efforts to market competitive goods," *Landscape Forms*, 113 F.3d at 380, courts must construe the Lanham Act "in light of a strong federal policy in favor of vigorously competitive markets." *Id.* at 379.

■ In order to prevail in an action for trade dress infringement under Section 43(a) of the Lanham Act, a plaintiff must prove "(1) that the mark is distinctive as to the source of the good, and (2) that there is a likelihood of confusion between its good and defendant's." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115–16 (2d Cir.2001); *see also Nora Bevs. v. Perrier Group of Am.*, 269 F.3d 114, 118 (2d Cir. 2001). Distinctiveness may be proven by showing that the intrinsic nature of the mark serves to identify a particular source or that "in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir.2001) (citing *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210, 120 S.Ct. 1339, 1343, 146 L.Ed.2d 182, 188 (2000), 2000 U.S. LEXIS 2197). The first showing, conventionally termed "secondary meaning" and labeled "acquired meaning" by Justice Scalia in *Samara Bros.*, is always required of the product design plaintiff because of the above-mentioned precautions regarding competition. *See Yurman Design*, 262 F.3d at 115.

■ Functional product design is not protected under Section 43(a) of the Lanham Act. *See* 15 U.S.C. § 1125(a)(3) ("In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional").

The Supreme Court has stated that placing the burden of proof as to functionality on the party asserting infringement "gives force to the well-established rule that trade dress protection may not be claimed for features that are functional." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001).

## A. Secondary Meaning

Cartier has sufficiently established the distinctiveness of the relevant designs insofar as they have acquired "secondary meaning." A mark acquires "secondary meaning" when "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Samara Bros.*, 529 U.S. at 211, 120 S.Ct. 1339. "The essential question with respect to secondary meaning is whether the public is moved to consume a product because of its source." *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 564 (2d Cir.1990). The factors employed in determining whether a mark has acquired secondary meaning include "advertising expenditures, consumer studies, sales, competitors' attempts to plagiarize the mark, and the length and exclusivity of the mark's use." *Friesland Brands*, 228 F.Supp.2d 399, 405 (S.D.N.Y.2002) (quoting *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 393 (2d Cir.1995)). Cartier has met its burden with respect to this claim for the reasons set forth below.

### 1. Advertising Expenditures

Cartier's advertising campaigns relative to the four watch families at issue in this case have been illustrated above and will be recounted here only in summary. Cartier's Panthere, Pasha, Tank Americaine and Tank Francaise have been extensively promoted and advertised over the past fifteen years. Cartier advertises nationally, regionally, and by means of a "co-op," all three of which are created by a company hired by Cartier. Cartier distributes catalogs via direct mail, through its authorized dealers and in its boutiques, and hosts "trunk shows" in which Cartier displays a collection of watches to dealers.

The Panthere, Pasha, Tank Americaine and Tank Francaise were launched in the United States in 1984, 1985, 1989 and 1996 respectively. With regard to the Panthere, the launch budget alone was in excess of $1,000,000 dollars, and in the years following the launch approximately $500,000 was spent on its promotion, which included advertisements in several major newspapers throughout the United States. *See, e.g.*, PX 278, No. 20382 (New York Times Panthere advertisement, November 7, 1984); PX 279, Nos. 20114, 20115 (Wall Street Journal Panthere advertisements, March 13, 1992, published in five different regions in the United States).

In 2000 and 2001 Cartier spent upwards of $1,000,000 and $2,000,000 dollars respectively in advertising the Pasha. Expenditures for the Tank Americaine average approximately $500,000 per year. For the Tank Francaise, total media spending has ranged from over $500,000 in 1999, to as much as $1,750,000 in 2000. As with the Panthere, print advertisements for the Pasha, Tank Americaine and Tank Francaise have appeared in numerous popular publications throughout the country. Further, a coffee table book entitled "Cartier, the Tank Watch," by Frank Cologni is given by Cartier to clients as a gift or distributed in its boutiques.

The court deems significant Cartier's advertising expenditures of between $500,000 and $2,000,000 per year. Substantial product launching events and smaller scale launches with cocktail parties at retail locations also evince considerable

expenditure of resources in advertising. Advertisements for the watch families in question have been printed in numerous publications throughout the country, and Cartier has attracted a considerable amount of unsolicited advertising in the form of media commentary in the popular press and in the specialized watch and luxury goods presses. Most noteworthy, the court finds, are statements in publications illustrating that Cartier watch designs have acquired secondary meaning in the marketplace. Watch Time in June 2001 wrote: "The watch, [is] designed to be recognizable as a Cartier .... Among the unmistakably Cartier characteristics are the threaded shaft lungs which dominate the slide view." The Robb Report wrote in its April–June 2001 edition that "the Cartier Tank is arguably one of the most recognizable status watches today."

Such extensive effort in advertising and promotion, as well as the attraction of commentators within and without the specialized luxury watch market, the court deems, weighs in favor of a finding that Cartier's products in question have acquired secondary meaning.

### 2. Consumer Studies

Defendants and Plaintiff both conducted surveys in order to assess the secondary meaning of the four Cartier watch families. Experts were retained to poll the public as to whether they associated the Panthere, Pasha, Tank Americaine, and Tank Francaise watch designs with Cartier. The methodologies of each of the parties' experts and the Court's analysis of their reports are described in detail in the Findings of Fact and will not be repeated here.

In substance, the consumer studies performed by the parties showed that a majority of consumers within the Cartier consumer population identifies the watches at issue with one source. Because these findings tend towards secondary meaning, the court finds that this factor weighs in favor of the plaintiff.

### 3. Sales

The Panthere is Cartier's fifth best-selling watch. At the time of its introduction into the U.S. market, the Panthere was $1,800 for the stainless steel model, $11,000–14,000 for the gold, and $2,200 to $2,700 for combinations of stainless steel and gold. At present, the steel versions retail beginning at $2,450, the gold go up to $11,400, and pavee versions sell for approximately $50,000. Between the years 1987 and 2002, Cartier and its authorized dealers sold 88,175 watches in the Panthere family for total sales over $313 million.

The Pasha is Cartier's fourth best-selling watch. Currently, steel versions retail for about $3,700, chrome and other versions from $6,000 to $7,000, 18 karat gold versions for about $30,000, and a full pavee Pasha with princess cut diamonds for about $208,000. Between 1987 and 2002, Cartier sold over 42,000 units for sales totaling over $180 million.

The Tank Americaine is Cartier's third best-selling watch. Gold Tanks with a leather strap begin at $5,500 and increase to $10,000 to $20,000 for models with metal bracelets, and a full pavee Tank retails for about $88,000. Between 1987 and 2002, Cartier sold 14,225 watches for sales totaling over $102 million.

The Tank Francaise is Cartier's top-selling watch family. Between 1987 and 2002, Cartier sold 93,750 Tank Francaise watches, for sales totaling over $266 million.

The foregoing confirms beyond question that Cartier has achieved considerable success in the sale of the Panthere, Pasha, Tank Americaine and Tank Francaise

watch designs. This factor therefore weighs in favor of a finding of secondary meaning.

### 4. *Competitors' Attempts to Plagiarize the Mark*

Secondary meaning may be supported by intentional copying, particularly when the purpose is " 'to benefit from the good will of the prior user through confusion.' " *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*, 312 F.Supp.2d 195, 208–09 (D.Conn.2004) (quoting *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 136 (2d Cir.1992)). This fact is not dispositive and "should be balanced against the recognition that ... imitation in the market is a good thing." *New Colt Holding Corp.*, 312 F.Supp.2d at 208–09.

In accordance with the court's findings of fact above, defendants' watches are undeniably similar to plaintiffs'. The relevant question therefore is whether the copying was done deliberately, so as to benefit from Cartier's name and good will. The court answers this in the affirmative. Most telling is the visit by plaintiffs' private investigator, Sharon Round, to defendants' office on 47th Street, where she posed as a potential purchaser. The hidden videotape introduced at trial showed advertisements belonging to Cartier that were taped to defendants' office wall. Defendants' Vice President Mike Genuth made direct comparisons between his watches and Cartier's, suggesting that they were the same. Genuth did this by gesturing between his watches and the Cartier watches featured in the ads, and holding his watch up to the Cartier ads so that Round, as a potential customer, could make a side-by-side comparison.

Further, Cartier introduced evidence to the effect that third party sellers invoke Cartier's name in selling their watches as a means of appealing to consumers. As il-lustrated by various web sites that sell watches, the practice is especially rampant among internet sellers who often use such terms as "Cartier style," "Tank style" or "Panthere style." PX 273 is a business card from a retailer named Aviannes that plaintiffs' investigator frequented; on the back of the card, the salesperson wrote, "Tank Francaise style $4,500" and "Panthere with diamond bezel $2,325." Round further testified that at Agosta Watch, Samo's Sons, Yaeger Watch Corp. and Niletti Creations, salespersons represented that they sell watches that are copies of the Cartier watches at issue or that their watches are "Cartier style" or look "just like" Cartier's.

The copying described above is plainly intentional. The court finds that these attempts to plagiarize are supportive of secondary meaning.

### 5. *Length and Exclusivity of Use*

The Panthere, Pasha, Tank Americaine and Tank Francaise were first marketed in 1984, 1985, 1989 and 1996, respectively, and gained recognition shortly after their introduction. The Panthere design has been used by plaintiffs for over twenty years, and the newest design, the Tank Francaise, has been in use for over eight years. Cases in this circuit have held comparable lengths of use meaningful to a determination of this factor. *See, e.g., Meese, Inc. v. Int'l Leisure Prods., Inc.*, 2003 WL 22902594 (S.D.N.Y.2003), 2003 U.S. Dist. LEXIS 22036 (plaintiff's offer of evidence that design of its product had remain unchanged since 1986 held supportive of secondary meaning); *Dana Braun, Inc. v. SML Sport Ltd.*, 2003 WL 22832265 (S.D.N.Y.2003), 2003 U.S. Dist. LEXIS 21349, 39–40 (that plaintiff's use of a particular catalog design since 1998 deemed significant); *Landscape Forms, Inc. v. Columbia Cascade Co.*, 117 F.Supp.2d 360,

367 (S.D.N.Y.2000) (plaintiff's introduction in 1989 helpful to finding of secondary meaning). Therefore, in terms of length of use of the trade dress in question, the court deems these lengths of time significant.

Plaintiffs introduced adequate evidence demonstrating its endeavors to maintain the exclusivity of use over its designs and its related successes. Cartier employs several methods in protecting its intellectual property, all of which have been met with some level of success in maintaining exclusivity. Cartier employs individuals dedicated solely to protecting its intellectual property, including an investigator to canvas 47th Street in Manhattan to detect potential copycats. Cartier has sent numerous "cease and desist" letters, which when not complied with were followed through with a lawsuit against the alleged infringers. Several of these letters were effective, among them letters to watchmakers Tourneau, Concord and Movado, which Cartier suspected of copying particular designs.

Such safeguards and undertakings, which have been successful in thwarting widespread use bolsters a finding of secondary meaning. *See Dana Braun*, 2003 WL 22832265 at *12–13, 2003 U.S. Dist. LEXIS at *39–40.

Both prongs of this factor clearly tip in favor of plaintiffs.

Although "[n]o 'single factor is determinative'" in judging secondary meaning, each of the above factors weighs in favor of the plaintiff. *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1222 (2d Cir.1987) (citations omitted). Taken together, the standard for a showing of secondary meaning has clearly been met. The court finds that as to the four watch designs in question, each has acquired secondary meaning in the marketplace.

## B. Likelihood of Confusion

The second half of the proof required of plaintiffs in order to prevail in an action for trade dress infringement under 43(a) of the Lanham Act is a showing of a likelihood of confusion between its good and defendant's. *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115–16 (2d Cir. 2001); *Nora Bevs. v. Perrier Group of Am.*, 269 F.3d 114, 118 (2d Cir.2001).

■ The standard for a showing of a likelihood of confusion was set forth by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961) ("Polaroid"), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). The *Polaroid* test entails a consideration of the following factors: (1) the strength of plaintiffs' mark; (2) the degree of similarity between plaintiffs' and defendant's marks; (3) the proximity of the products; (4) the likelihood that either owner will bridge the gap, using the mark on products closer to the other's area of commerce; (5) the sophistication of the buyers and the quality of defendants' product; (6) actual confusion; and (7) good or bad faith. *See TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88, 100 (2d Cir.2001). A court's evaluation of these factors ought not to be mechanical, nor is any one factor determinative. *See Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269 F.3d 114, 119 (2d Cir. 2001); *Plus Prods. v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1004 (2d Cir. 1983); *Friesland Brands, B.V. v. Vietnam National Milk Co.*, 228 F.Supp.2d 399, 404 (S.D.N.Y.2002). Rather, by evaluating all of these factors together, a court "should focus on the ultimate question of whether consumers are likely to be confused." *Tactica*, 154 F.Supp 2d at 602 (citing *Paddington Corp. v. Attiki Importers & Dis-*

tributors, Inc., 996 F.2d 577, 584 (2d Cir. 1993)). The court now applies this analysis to the instant case.

### 1. Strength of the Trade Dress

 This factor refers to a mark's "'tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source.'" 1–800 Contacts, Inc. v. WhenU.com, 309 F.Supp.2d 467, 495 (S.D.N.Y.2003) (quoting W.W.W. Pharmaceutical Co., Inc. v. Gillette Co., 984 F.2d 567, 572 (2d Cir. 1993) limited on other grounds). "[A] mark may be conceptually strong and yet commercially weak if the mark lacks the requisite 'origin-indicating' quality in the eyes of consumers." Sunenblick v. Harrell, 895 F.Supp. 616, 626 (S.D.N.Y.1995) (citation omitted).

The court believes that its discussion above concerning the secondary meaning of the relevant products is dispositive of this factor in the Polaroid analysis. Plaintiffs have shown substantial efforts in advertising and promotion and adduced evidence of the attraction of commentators from diverse markets. They have shown that the relevant consumer population identifies the watches at issue with one source. They have achieved considerable sales success, third parties have attempted to plagiarize their designs, and the designs in question have been in use for a number of years. Finally, plaintiffs have endeavored with some success to maintain exclusivity of use. This evidence dictates a finding that all of the four watch designs in question are of significant strength.

### 2. Similarity of the Marks

"The comparison of marks is an inquiry designed to determine the 'general impression conveyed to the purchasing public by the respective marks.'" Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 77 (2d Cir.1988) (quoting C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc., 753 F.2d 14, 18 (2d Cir.1985)). In assessing the similarity between two marks, a court must look to whether the similarity is likely to cause customer confusion. See Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 962 (2d Cir.1996). "[C]ourts must appraise the overall impression created by . . . the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." Friesland Brands, 228 F.Supp 2d at 405 (internal citations and quotations. omitted). As this court has stated, consumers will generally not see watches such as plaintiffs' and defendants' displayed side-by-side; rather, the watches will often be viewed in isolation in display cases, in catalogs and on wearers' wrists. In these multifarious contexts, the court finds that even consumers who are familiar with Cartier's designs would be unlikely to notice small but nonetheless significant differences between, for example, the Pasha and a copy. Rather, it is likely that they would believe that defendants' watches are somehow associated with Cartier. Cartier, Inc. v. Four Star Jewelry Creations Inc., 2003 WL 21056809, at *11–12 (S.D.N.Y. 2003), 2003 U.S. Dist. LEXIS 7844, *30–31. This combined with the explanations in the Findings of Fact, which detail the particular similarities among the watch designs and show that defendants' watches are practically identical to plaintiffs', the court finds that there are strong similarities between the Panthere, Pasha, Tank Americaine and Tank Francaise designs and defendants' watches. This factor favors Cartier.

### 3. Proximity of the Products

This factor "addresses whether, due to the commercial proximity of the competitive products, consumers may be confused

as to their source." *Hasbro*, 858 F.2d at 77 (2d Cir.1988). Proximity is measured by "the nature of the products themselves and the structure of the relevant market." *Tactica*, 154 F.Supp.2d at 602 (quoting *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 967 (2d Cir.1981)). Both Cartier's and defendants' products are what might be termed luxury watches. The price of Cartier's watches ranges from $2,450 to $208,000. Defendants' watches are advertised to sell for $7,000 to $10,000. The products in question are similar and are designed for the same purpose. The proximity of the watches is therefore sufficiently close to create a likelihood of confusion.

### 4. Bridging the Gap

"Bridging the gap" refers to the probability of defendants entering plaintiffs' business or of the average customer's perception that defendants would enter plaintiffs' market. *Malletier v. Dooney & Bourke, Inc.*, 340 F.Supp.2d 415, 432 (S.D.N.Y.2004), 2004 U.S. Dist. LEXIS 17295, *32. "The issue here is whether the two companies are likely to compete directly in the same market." *Charles of the Ritz Group, Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317, 1322 (2d Cir. 1987). To the extent that Cartier's and defendants' products compete in the same market, there is no gap to be bridged. *See, e.g., Malletier*, 340 F.Supp.2d 415, 432, 2004 U.S. Dist. LEXIS at *32.

### 5. Sophistication of Buyers

This factor recognizes that consumer confusion between the products in question is partly dependent upon the sophistication of the relevant purchasers. at 343, 2004 U.S. Dist. LEXIS at *37 (quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir.1995)). In assessing this factor, the court must consider "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods ...." *Gillette*, 984 F.2d at 575 (citation omitted). Consumers of expensive goods may be held to a high standard of purchasing care. *See McGregor–Doniger, Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1137 (2d Cir.1979). "Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source or sponsorship of the product." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992). Thus, since Cartier's products are relatively expensive, this factor would presumably weigh against a finding of a likelihood of confusion.

However, the general assumption that sophisticated consumers are less likely to be confused is not absolute. The court in *Coach Leatherware Company, Inc. v. Ann-Taylor, Inc.*, 933 F.2d 162, 170 (2d Cir. 1991) embodied this notion: "[R]ecognition of [plaintiffs'] sophisticated consumer base does not necessarily bolster ... [the] claim that confusion is unlikely." *Coach Leatherware*, 933 F.2d at 170. Indeed, in *Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.1986) the Second Circuit rejected the argument that a sophisticated consumer base decreased the likelihood of confusion where a designer jeans manufacturer had incorporated a pocket stitching pattern that was nearly identical to the one made famous by Levi Strauss & Co. *Id.* The Court concluded that it is the sophisticated consumer "who is most likely to assume that the presence of appellee's trademark stitching pattern on appellants' jeans indicates some sort of association between the two manufacturers. Presumably it is these sophisticated jeans buyers who pay the most attention to back pocket stitching patterns and their

'meanings.'" *Lois Sportswear*, 799 F.2d at 875. *See also Goodheart Clothing Company, Inc. v. Laura Goodman Enterprises, Inc.*, 1988 WL 85469, *5 (S.D.N.Y. Aug.10, 1988); *1–800 Contacts, Inc. v. WhenU.com*, 309 F.Supp.2d 467, 502–03 (S.D.N.Y.2003). The court in *Tough Traveler v. Outbound Prods.*, 989 F.Supp. 203, 216–217 (N.D.N.Y.1997) cautioned, however, that "[t]his theory does not reverse the normal effect of sophistication, but merely suggests why it might not be determinative in certain contexts." *Id.*

There are a number of circumstances where confusion is actionable, including where "(1) prospective purchasers believe that the senior user sponsored or otherwise approved of the junior user's trademark; (2) potential consumers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase; and (3) customers are confused as to the source of the junior user's product when this product is observed in the post-sale context." *Jordache Enters., Inc. v. Levi Strauss & Co.*, 841 F.Supp. 506, 514–15 (S.D.N.Y.1993) (internal citations omitted). Cartier asserts that all three of these types of confusion—confusion as to sponsorship, initial interest confusion, and post-sale confusion—are present in this case and are actionable, not in spite of, but indeed because of, the sophistication of the relevant consumer group.

Although the presence of initial confusion by sophisticated consumers is suggested by plaintiffs, this court concludes that the evidence presented is inadequate to make a determination with regard to this factor. No evidence was introduced tending to show that initial or post-sale confusion exists because of, rather than in spite of, the sophistication of the luxury watch consumer and the court declines to speculate on the matter. Further, no evidence was put forth suggesting a sponsorship relationship between the parties or that consumers assume such a relationship and act on that assumption. *See Tough Traveler*, 989 F.Supp. at 216–17 (lacking evidence of a relationship between the parties, the court should not assume that consumers suppose one exists).

### 6. Quality of Defendants' Product

This prong deals with the possibility of the inferior product causing injury to the superior product because "'people may think that the senior and junior products came from the same source ... or products of equal quality may tend to create confusion as to source because of this very similarity.'" *1–800 Contacts*, 309 F.Supp.2d at 502, (quoting *Hormel Foods Corp. v. Jim Henson Prods.*, 73 F.3d 497, 505 (2d Cir.1996)).

Cartier has not presented sufficient evidence with respect to the quality of defendants' products. Plaintiffs draw attention to defendants' "admission" that their watches are of lower quality. The record reflects that the witness' answer to this query is not clear as to admitting their watches are of lower quality. The court finds this evidence insufficient to tip the scales either way.

### 7. Actual Confusion

The Lanham Act does not require evidence of actual confusion as a prerequisite to recovery. *See Lois Sportswear*, 799 F.2d at 875 ("[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source"). Cartier has not presented any evidence of actual confusion. Defendants suggest that confusion is unlikely due to both parties' lengthy period of

sales. While the presence or absence of actual confusion may show a high or low likelihood of confusion, no evidence has been introduced suggesting either. *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir., 1999). Therefore, the evidence here is insufficient to militate for plaintiffs or defendants.

### 8. *Good or bad faith*

This factor concerns whether defendants adopted the marks with the intention of capitalizing on Cartier's reputation and goodwill, as well as any customer confusion as to the source of the products. *See Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 482–83 (2d Cir.1996). The Second Circuit in *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258–259 (2d Cir.1987) quotes a treatise in its central holding for a summation of this element: "Where we can perceive freedom of choice with full knowledge of a senior user's mark, we can readily read into defendant's choice of a confusingly similar mark the intent to get a free ride upon the reputation of a well-known mark." *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258–259 (2d Cir., 1987) (quoting 2 J. McCarthy, *Trademarks and Unfair Competition*, § 23:8 at 68 & n. 10 (2d ed.1984)).

As this court has stated in a previous opinion, it is not necessary to infer bad faith where a second comer has prior knowledge of a senior user's mark. *See Streetwise Maps v. VanDam, Inc.*, 159 F.3d 739, 745–746 (2d Cir.1998). However, evidence produced in this case indicates a scenario corresponding to that illustrated above in *Mobil Oil*; defendants had knowledge of plaintiffs' design and did not innocently choose a confusingly similar design.

Defendants' watches are virtually identical to plaintiffs'. Defendants' vice-president Genuth suggested to plaintiffs' pri-

vate investigator Ms. Round while showing her watches in defendants' inventory that defendants' watches were exactly the same as Cartier watches. Genuth compared defendants' watches to advertisements of plaintiffs' watches and pointed out similar features—those that make defendants' watches especially difficult to distinguish from plaintiffs'. Genuth further indicated to Ms. Round that the watches had the same stem dial, bracelet and that they looked exactly the same. Tr. at 579. The foregoing all suggests a showing of bad faith.

Malek's testimony at trial supports plaintiffs' claim. Malek maintained that he had never seen a Cartier Pasha watch at the time defendants began to sell and advertise their watches, despite the fact that they looked startlingly similar to Cartier's Pasha. However, the video taken by Round and introduced as PX 224A clearly shows a Cartier advertisement featuring a Pasha affixed to defendants' office wall. Tr. at 900–01; PX 224A. This evinces bad faith on defendants' part.

In opposing plaintiffs' allegation of defendants' bad faith, defendants claim they had a good faith belief that the contended designs were in the public domain. Yet, upon abrupt recollection at trial, Malek stated that defendants consulted counsel in connection with Cartier's cease and desist letter. Ostensibly to bolster their assertion of good faith, defendants suddenly recalled having received plaintiffs' cease and desist letter, despite having previously testified that they did not see it until their depositions in 2003. Defendants' inconsistent positions on this point militates toward a finding of bad faith.

Finally, defendants have drawn attention to a recent Federal Circuit opinion, *Knorr–Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 344 F.3d 1336 (Fed.Cir.2004), 2004 U.S.App. LEXIS

19185. In the trial court *Knorr–Bremse* dealt with an alleged violation of plaintiff's patent on disc brakes. *Knorr–Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 344 F.3d 1336 (Fed.Cir.2003). The issue on appeal was the finding of willful infringement and the award of attorney's fees, which were vacated and the case was remanded. The central holding of *Knorr–Bremse* rejects the precedent in patent cases that draws an adverse inference from undisclosed advice of counsel, or failure to consult counsel, with respect to alleged or possible infringements. *Id.* at 1345–1346., 2004 U.S.App. LEXIS 19185, at 21–22. The court reasoned that although the focus of this rule was on disrespect for law, the implementation of the precedent has resulted in inappropriate burdens on the attorney-client relationship. *Id.* at 1343–1344, 2004 U.S.App. LEXIS 19185, at 16–17. Defendants therefore posit that no adverse inference may thus be drawn for their failure to disclose their consultation.

Plaintiffs counter that the basis for plaintiffs' assertion of bad faith on the part of defendants with regard to this issue is the withholding of defendants' consultation until the middle of trial, which deprived plaintiffs of the opportunity to explore the matter in discovery. *Knorr–Bremse* is inapposite. Plaintiffs do not argue that failure to consult counsel, or to disclose advice of counsel, compels the conclusion that the opinion obtained was or would have been negative. They assert that defendants' failure to alert plaintiffs of the fact that defendants consulted counsel until the middle of trial deprived them of the opportunity to perform discovery.

Based on the foregoing, Cartier has presented sufficient evidence to warrant giving a finding of bad faith.

Weighing all of the Polaroid factors, the court concludes that defendants' use of the allegedly infringing designs is likely to cause customer confusion.

## C. Non–Functionality

██ Finally, Cartier must meet the congressionally-imposed requirement that a plaintiff prove that an unregistered trade dress is "not functional." *See* Trademarks Amendments Act of 1999 § 5, Pub.L. 106–43 (August 5, 1999), codified at 15 U.S.C.A. § 1125(a)(3) (West Supp.2001). "[A] product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Yurman,* 262 F.3d at 116 (quoting TrafFix, 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001)). In cases involving aesthetic features, the dress is functional if the right to use it exclusively "would put competitors at a significant non-reputation-related disadvantage." *Id.* In other words, defendants must show that the features are "essential to effective competition in a particular market." *Fruit–Ices Corp. v. Coolbrands, Int'l Inc.*, 335 F.Supp.2d 412 (S.D.N.Y. 2004), 2004 U.S. Dist. LEXIS 16714 (citing *Fun–Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 1002 (2d Cir. 1997)).

As fully set forth in the Findings of Fact above (III.B. *supra* ), the court finds that Cartier's claimed trade dress is not functional.

Having determined that plaintiffs' trade dress has acquired secondary meaning, that there is a likelihood of confusion between its goods and defendants', and that plaintiffs' claimed trade dress is not functional, the court concludes that plaintiffs succeed on their Lanham Act trade dress infringement claim.

## III. False Advertising

### 1. Standard and Analysis

██ A false advertising claim under the Lanham Act asserts that a competitor

has made fraudulent representations that goods marketed have ingredients or qualities that they in fact do not have but that the goods of the competitor do have. *Alto Prods. Corp. v. Ratek Indus.*, 1996 WL 497027, *8–9 (S.D.N.Y.1996), 1996 U.S. Dist. LEXIS 12812, 28–29.

■ Plaintiffs allege that defendants falsely advertised by making false oral representations to investigators and by posting plaintiffs' advertisements on defendants' office walls. The Second Circuit held in *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir.2002) that defendants' actions must be "part of an organized campaign to penetrate the relevant market" to qualify as "commercial advertising or promotion" under the Act. *Id.* An organized campaign to penetrate the relevant market generally consists of widespread dissemination within the relevant industry. *Id.* The contested representations in this case do not rise to the level of commercial advertising or promotion. The conduct plaintiffs complain of, making false oral representations and posting plaintiffs' advertisements on defendants' walls, cannot be characterized as widespread dissemination or an organized campaign. Therefore, plaintiffs' false advertising claim under the Lanham Act fails.

## IV. False Designation of Origin

### 1. Standard and Analysis

■ A claim of false designation of origin alleges the "[use] in commerce [of] any . . . false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion . . . as to the . . . origin . . . of . . . goods." 15 U.S.C. § 1125(a)(1).

Plaintiffs here claim that inasmuch as the designations "Swiss Made" or "Ge-

neve" indicate the manufacture in that locale, defendants' designations are false because their watches are not assembled in Switzerland. Plaintiffs, however, have not put forth sufficient evidence to show that consumers believe the terms "Swiss Made" or "Geneve" to designate a particular origin. Jean Daniel Pasche, President of the Federation of the Swiss Watch Industry, testified that the term "Swiss Made" is exclusively reserved for watches with Swiss movements, cased in Switzerland, and inspected in Switzerland. Pasche Dep. Tr. at 9; PX 32 at 3. While this is the policy of the Swiss Watch Federation, there is no such law in the United States with respect to this terminology. Indeed, Cartier's own counsel testified that the term "Swiss Made" connotes only that the watch has a Swiss Movement. Given the inconsistent interpretations of these terms within the watch industry and the lack of evidence otherwise, Cartier has not shown that consumers are likely to be misled by the false designations complained of. Plaintiffs' claim of false designation of origin therefore fails.

## V. New York State Law Claims

### 1. Common Law Trade Dress Infringement

■ In general, the standard for a showing of trade dress infringement under New York law is similar to that of the Lanham Act. *See Neutrik AG v. Switchcraft, Inc.*, 2001 WL 286722 *1, n. 2 (S.D.N.Y. Mar.23, 2001), *aff'd*, 31 Fed. Appx. 718 (Fed.Cir.2002). Under New York common law, however, there is no requirement to show secondary meaning for distinctive designs. *Id. See also Ideal Toy*, 530 F.Supp. at 379 ("Under New York law, even if plaintiff does not show secondary meaning, it is sufficient to sustain the issuance of an injunction that plaintiff show that the trade dress of a

second corner is confusingly similar to its own") (Motley, J.); *Commerce Foods, Inc. v. PLC Commerce Corporation,* 504 F.Supp. 190, 193 (S.D.N.Y.1980) ("Under New York law, ... an injunction may issue against a confusingly similar trade dress, even if no secondary meaning is shown."). In any event, the court is satisfied that Cartier has established both secondary meaning and likelihood of confusion. Plaintiffs therefore prevail on this claim.

### 2. Unfair Competition

■ The standards for Section 43(a) Lanham Act claims are virtually indistinguishable from unfair competition claims under New York law. *Tri–Star Pictures, Inc. v. Unger,* 14 F.Supp.2d 339, 363–364 (S.D.N.Y.1998). To succeed on their claim, plaintiffs must show a likelihood of confusion and bad faith. *See Id.* Both of these have been shown in this case. As stated earlier, plaintiffs demonstrated a likelihood of confusion through an analysis of the *Polaroid* factors. The factor concerning good or bad faith weighed in favor of plaintiffs. *Supra* § II.B.; *see Polaroid,* 287 F.2d at 495. Therefore, plaintiffs succeed on their unfair competition claim under New York Law.

### 3. General Business Law §§ 349 and 350

Plaintiffs claim that defendants have violated Sections 349 and 350 of the New York General Business Law, which make unlawful "deceptive acts and practices" and "false advertising in the conduct of business." N.Y. GEN. BUS. L. §§ 349, 350.

■ Defendants assert that plaintiffs lack standing to sue because Cartier is a competitor and not a consumer. The Second Circuit has stated, however, that corporate competitors have standing to bring suit under Section 349 "so long as some harm to the public at large is at issue." *Securitron Magnalock Corp. v. Schnabolk,*

65 F.3d 256, 264 (2d Cir.1995) (quoting *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 786 F.Supp. 182, 215 (E.D.N.Y.) (vacated in part on other grounds, 973 F.2d 1033 (2d Cir.1992))).

Disputes more appropriately regarded as private are not contemplated by the statutes, which are aimed at those practices having "a broader impact on consumers at large." *Gaidon v. Guardian Life Ins. Co. of Am.,* 94 N.Y.2d 330, 344, 704 N.Y.S.2d 177, 725 N.E.2d 598 (N.Y.1999). (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741, (N.Y.1995) (internal quotations omitted)). Writing in *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995), Chief Judge Kaye held that "[a] prima facie case requires as well a showing that defendant is engaging in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof." *Id.* at 25, 623 N.Y.S.2d 529, 647 N.E.2d 741. The Second Circuit has applied New York's interpretation, stating that a finding of consumer-oriented conduct that would mislead a reasonable consumer is required. *See Maurizio v. Goldsmith,* 230 F.3d 518, 521–522 (2d Cir.2000), 2000 U.S.App. LEXIS 27277, 9–12. The conduct alleged in this case would have an impact on consumers at large if proved because contrasted to a private dispute, the contested practices were not limited so as only to affect plaintiffs and defendants or a small section of the public. For example, the record does not indicate that defendants dealt with plaintiffs' investigator differently than any prospective watch consumer that appeared at their offices. *See Oswego Laborers',* 85 N.Y.2d at 25, 623 N.Y.S.2d 529, 647 N.E.2d 741.

■ However, plaintiffs have not satisfactorily shown that a reasonable consum-

er would be mislead by the contested representations under New York General Business Law Section 349. As stated in the Lanham Act analyses above, it is not law in this country that the term "Swiss Made" is reserved for watches manufactured, cased and inspected in Switzerland, and counsel for plaintiffs testified that to him the term "Swiss Made" connotes only that the watch has a Swiss Movement. Therefore, Cartier will not prevail on its New York General Business Law Section 349 claim.

■ The court concludes that plaintiffs' claim also fails with respect to New York General Business Law Section 350. ("To establish a cause of action pursuant to [Section 350] a plaintiff is only required to demonstrate that the advertisement was misleading in a material respect and he was injured, while an injured person has been defined as one who was misled or deceived by such an advertisement."). *Maurizio v. Goldsmith*, 230 F.3d 518, 522 (2d Cir.2000) (quoting *McDonald v. North Shore Yacht Sales, Inc.*, 134 Misc.2d 910, 513 N.Y.S.2d 590, 593 (1987) (internal quotations omitted)). Here again, Cartier claims that the use of the designations "Swiss Made" and "Geneve" are misleading in a material way. Satisfactory evidence has not been brought forward to uphold this claim. Additionally, plaintiffs' allegation that they are injured as a competitor by defendants' use of the reputations of Switzerland and Geneva is too vague.

## VI. Laches

■ Defendants raise the defense of laches, asserting that Plaintiffs' trade dress infringement claims are barred by unreasonable delay in bringing the present action. To succeed on a claim of laches, a defendant must show "(1) that the plaintiff had knowledge of defendant's use of its marks, (2) that plaintiff inexcusably de-

layed in taking action, and (3) that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights by its delay in bringing suit." *Deere & Co. v. MTD Holdings, Inc.*, 2004 WL 324890, \*18 (S.D.N.Y.2004), 2004 U.S. Dist. LEXIS 2550, 55–56 (quoting *Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc.*, 88 F.Supp.2d 188, 196 (S.D.N.Y.2000)).

■ Defendants' laches defense fails because plaintiffs did not have knowledge of defendants' use of its marks until approximately one year before filing their complaint. Bharat Dube, plaintiffs' in-house counsel testified that Cartier had no awareness of defendants or their alleged infringements until 2000. Tr. at 464. Plaintiffs had been canvassing the 47th Street area for possible infringers since 1995, but defendants' office was not at the time visible from the street, and their sales of the infringing items were relatively few. *See* PX–19. Any delay in filing suit was therefore minimal.

Further, defendants do not argue that they have been prejudiced by plaintiffs' alleged delay, aside from the declaration that they "reasonably relied on Cartier's inaction to [their] detriment." Def.'s Prop. Findings of Fact and Conclusions of Law at 52. Defendants put forth no evidence of this reliance, and no evidence of any detriment incurred thereby. Even assuming a delay, defendants' testimony that their overall sales from 1999 to 2003 was approximately $1,000,000 per year, Tr. at 741–42, leads the court to conclude that $10,000 per year in sales of the watches at issue is relatively minimal and would not be prejudicial.

## VII. Remedies

### A. Lanham Act Relief

#### 1. Permanent Injunction

Plaintiffs have shown success on the merits of its Lanham Act trade dress

claim, its common law trade dress infringement claim and its New York unfair competition claim. Plaintiffs have also shown likelihood of confusion, thereby establishing a risk of irreparable harm. *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir.1995) ("In the trade dress context, a showing of likelihood of confusion as to source will establish a risk of irreparable harm."). A permanent injunction will therefore issue enjoining future violations of Cartier's trade dress rights.

### 2. Accounting of Profits

██ The court concludes that an accounting is warranted in this case. "Profits may be awarded in cases of trademark infringement or unfair competition: (1) as a measure of plaintiff's damages; (2) if the defendant has been unjustly enriched; or (3) if necessary to deter a willful infringer from doing so again." *Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*, 2004 WL 896952, *9 (E.D.N.Y.2004), 2004 U.S. Dist. LEXIS 10426, 32–37 (citing *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir.1992)). A finding of willful conduct is a prerequisite for an award of profits under any of these three grounds. *Id.*

██ The accounting is justified on at least two of the three above grounds. Defendants have been unjustly enriched by any profit they have gained from their infringing use. The court therefore orders that plaintiffs, the rightful owners of the profits secured by use of their own good will and reputation, shall have restitution.

Plaintiffs have shown that defendants acted willfully. As set forth earlier, the evidence has demonstrated that defendants' watches are virtually identical to plaintiffs'. This, along with defendants' conduct in the investigative videotape exemplifies defendants' intentions to capitalize on Cartier's reputation. Moreover, the bad faith finding is reinforced by defendants' testimony at trial that they never saw a Cartier Pasha watch, despite the advertisement on their office wall, and defendants' inconsistent positions with regard to the cease and desist letter.

"In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of costs or deductions claimed." 15 U.S.C. § 1117. Defendants produced invoices showing sales of watches accused of infringing Cartier's trade dress. *See* PX–19. In his testimony, Malek stated that the invoices collected in Plaintiffs' Exhibit 19 is a complete collection of invoices of defendants' sales from February 1, 1999 until February 8, 2001. During this period, defendants' total sales of the watches in question were approximately $35,000, representing the sale of 22 watches, with gross profits totaling about $10,000. Tr. at 890–93. Extrapolating profits from the evidence submitted above, the court concludes that defendants' gross profits relating to the accused watches for each year 1999 to 2000 and 2000 to 2001 were $5,000 per year, with each watch on average profiting $1,250 per year.[9]

██ Cartier claims it is entitled to profits for a period dating back to six years prior to the filing of the complaint in

---

9. The court is aware that this calculation is not exact because in the two year period 1999 to 2001, only three watches had been introduced, with the Pasha following in 2002. Thus, profits from 2002 to the present would presumably be higher because of the added watch design and the profits flowing there-

from. This possible inequity is balanced by the probability that profits in years predating the evidence of profits from 1999 to 2001 were less. *See* 15 U.S.C. § 1117 (a court in its discretion may enhance or reduce the award in order to correct inadequacy or excessiveness).

December 2001, based on what the statute of limitations period would have been, to the present. Pl.'s Findings at 171. The accounting period should be co-extensive with the period of infringement. 5 *McCarthy on Trademarks and Unfair Competition* § 30:70 (4th ed.2004). Therefore, profits will be calculated from 1996 to the present.

Obviously, defendants could not have profited from watches it could not have sold. Therefore, it will not be held to account for profits gained on watches that had yet to enter the market. In accordance with the Findings of Fact above, defendants entered the market with watches looking like the Panthere in 1990, the Tank Americaine in 1997, the Tank Francaise in 1999 and the Pasha in 2002. Since each trade dress had gained public recognition by the time defendants began to offer it for sale, and lacking other evidence to guide it, the court will assume equal sales each year. Utilizing the $1,250 figure from above, total profits from each watch design during the accounting period are as follows: Panthere: $11,250; Tank Americaine: $10,000; Tank Francaise: $7,500; Pasha: $3,750. This brings the total profits to approximately $32,500, which will serve as the profits due to plaintiffs.

### 3. Punitive Damages

■ Plaintiffs contend they are due punitive damages under the Lanham Act and New York Law. While defendants' conduct was less than commendable, the court does not feel that defendants' conduct rose to the level of "gross, wanton or willful fraud or other morally culpable conduct to an extreme degree" contemplated in those cases which have awarded punitive damages. This aspect of plaintiffs' requested relief will therefore not be awarded. *See Getty Petroleum Corp. v.*

*Island Transport. Corp.,* 878 F.2d 650, 657 (2d Cir.1989).

### 4. Attorney's Fees and Costs

■ Attorney's fees are authorized only in "exceptional cases" and may be justified when bad faith infringement has been shown. 15 U.S.C. § 1117(a); *Cache, Inc. v. M.Z. Berger & Co.,* 2001 WL 38283 (S.D.N.Y.2001), 2001 U.S. Dist. LEXIS 226 (quoting *International Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.,* 80 F.3d 749, 753 (2d Cir.1996)). The court finds that attorney's fees are not appropriate in this case. Although the court concludes that defendants acted in bad faith, the court is not prepared to term this case "exceptional," and therefore this aspect of plaintiffs' requested relief will not be granted.

### B. Common Law Relief

### 1. "Safe Distance"

■ Plaintiffs suggest that defendants should be ordered to maintain a "safe distance" from the line separating infringement and non-infringement. This is a request to enjoin non-infringing items to prevent against future infringements and any possible benefit from "residual good will." Pl.'s Proposed Findings at 166. It appears that the safe distance rule has generally been applied in consideration of a party's duty to abide by a previous court order upon a finding of infringement. *See Majestic Drug Co. v. Olla Beauty Supply,* 1997 WL 37955, *13–14 (S.D.N.Y.1997), 1997 U.S. Dist. LEXIS 900, 39–40. The court declines to chart a new course for the rule.

### CONCLUSION

For the foregoing reasons, judgment will be entered in favor of plaintiffs on the Lanham Act claim of trade dress infringement, common law trade dress infringe-

ment, and on the New York Law claim of unfair competition.

## JUDGMENT AND FINAL INJUNCTION

For the reasons set forth in the Findings of Fact and Conclusions of Law filed simultaneously herewith, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that plaintiffs shall take judgment against the defendants, and further that:

1. This court has jurisdiction over the parties and the subject matter.

2. Defendants have infringed plaintiffs' Panthere, Pasha, Tank Americaine, and Tank Francaise trade dresses and have engaged in acts of unfair competition against plaintiffs.

3. Defendants, and all those acting in concert or participating with them, are hereby permanently enjoined from manufacturing, importing, distributing, shipping, advertising, marketing, promoting, selling or offering for sale any product bearing plaintiffs' Panthere, Pasha, Tank Americaine, and Tank Francaise trade dresses, or any trade dress similar thereto or likely to cause confusion therewith, in the sale, offering for sale, distribution or advertising of plaintiffs' Panthere, Pasha, Tank Americaine, and Tank Francaise trade dresses.

4. Defendants, and all those acting in concert or participating with them, are further permanently enjoined from manufacturing, importing, distributing, shipping, advertising, marketing, promoting, selling or offering for sale the following watches: Globe XW98, GW882, W1984, W1986, W1989, GW863, GW892, GW866, W1994, XGW265, XGW266, GW875, XW39, XW40, XW41, XW43, XW42, XW46, XW49, XW50, XW51, XW57, XW58, XW59, XW56, XW60, XW61, XW66, XW67, XW68, XW95, XW96, XW97, GW880, GW881, W1982, W1988, W 1987, W1992, W1993, GW755, W1688, XGW267, XGW268, GW879, XW47, XW93, XW94, W2002, W1704, W1703, W1979, W1983, GW610, GW646, W1151, W1262, GW648, W1689, XW1678, XW1679, XGW245, XGW246, XGW247, XGW248, and Crown Classic L803, L901, L1004, L1005, L1006, L1007, L801, L804, L805, L806, L807, L906, L1001, L1002, L1003, L802, L905, L907, as depicted in plaintiffs' exhibits 255 through and including 258, or any colorable variations thereof or any product containing a confusingly similar trade dress.

5. Plaintiffs' shall recover profits from defendants in the amount of $32,500, by reason of defendants' acts of infringement and unfair competition.

The Clerk of Court is directed to close this case and remove it from the court's active docket.

**SO ORDERED.**